[Cite as *State v. D.S.*, 2021-Ohio-1725.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                                    :

     Plaintiff-Appellee,                   :

                               No. 109346

     v.                                          :

D.S.,                                             :

     Defendant-Appellant.                  :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART AND VACATED IN PART
**RELEASED AND JOURNALIZED:** May 20, 2021

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-19-638997-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kelly N. Mason, Assistant Prosecuting Attorney, *for appellee.*

Allison S. Breneman, *for appellant.*

EILEEN T. GALLAGHER, J.:

{¶ 1} Defendant-appellant, D.S.,[1] appeals his convictions and claims the following three errors:

---

[1] Pursuant to Loc.App.R. 13.2(B)(1), we refer to the appellant and the victims by initials and generic terms to protect the victims' privacy.

1. The jury found, against the manifest weight of the evidence, that the appellant committed the acts charged in the indictment.

2. The evidence was not legally sufficient to sustain a guilty verdict.

3. Appellant was denied effective assistance of counsel in violation of Amendments VI and XIV of the United States Constitution and Article I, Section 10, of the Ohio Constitution.

{¶ 2} We find some merit to the appeal, we affirm the trial court's judgment in part, and we vacate Counts 15 and 25 due to insufficient evidence.

## I. Facts and Procedural History

{¶ 3} D.S. was charged with 13 counts of rape in violation of R.C. 2907.02(A)(1)(b), three counts of gross sexual imposition ("GSI") in violation of R.C. 2907.05(A)(4), ten counts of illegal use of a minor in nude material or performance in violation of R.C. 2907.323(A)(2), three counts of child endangering in violation of R.C. 2919.22(B)(1), three counts of having weapons while under disability in violation of R.C. 2923.13(A)(2), three counts of attempted rape in violation of R.C. 2907.02(A)(1)(b), one count of kidnapping in violation of R.C. 2905.01(A)(4), and two counts of felonious assault in violation of R.C. 2903.11(A)(1). The indictment alleged that D.S. sexually abused his three daughters: Victim 1, Victim 2, and Victim 3 over a period of years.

{¶ 4} Detective Terry Lowther, of the Cleveland Police Department, testified at a jury trial that on April 10, 2019, D.S.'s wife, who is also the victims' mother ("Mother"), came to the Fifth District police station to report that D.S. had sexually abused their children. (Tr. 734.) Lowther observed that Mother was "emotionally distraught" in describing the abuse. (Tr. 735.) Lowther arranged for the children to

be taken by EMS to Rainbow Babies and Children's Hospital for sexual assault examinations and treatment. (Tr. 736.)

{¶ 5} Sally McHugh, a social worker with the Cuyahoga County Department of Child and Family Services ("CCDCFS"), testified that she was trained to investigate child sexual abuse cases. (Tr. 744.) McHugh met the children at the hospital but interviewed them the following day in a room where a detective could observe the interview. (Tr. 753.) McHugh interviewed each child separately, but they each described similar experiences. According to McHugh, two of the girls had previously told Mother about the about the abuse, and Mother told them to "keep it inside" because "she was going to figure it out." (Tr. 757.) Mother failed to take action, and the abuse continued. One of the victims told McHugh that D.S. threatened to kill her if she told Mother or anyone. (Tr. 759.)

{¶ 6} McHugh's investigation revealed that there had been several prior referrals to CCDCFS due to reports of suspected abuse and domestic violence, but no action was taken because the allegations were "unsubstantiated." (Tr. 757.) However, following the disclosure of sexual abuse in April 2019, the agency obtained custody of the children due to the fact that Mother knew of the abuse and did nothing to protect the children. The children were placed in foster care where they have been receiving regular counseling services. (Tr. 760.)

{¶ 7} McHugh testified that there are three possible dispositions following a sexual abuse investigation: (1) unsubstantiated, which means the allegations may be true but there is no corroborating evidence; (2) indicated, which is a determination

that abuse likely happened based on a detailed disclosure from the child victim and evidence that the victim has consistently told other people; and (3) substantiated, which is a determination that the abuse happened based on an admission by the perpetrator, medical evidence, witnesses who observed the abuse, or other corroborating evidence. (Tr. 749-750.)

{¶ 8} McHugh found the sexual abuse allegations in this case were substantiated based on the victims' detailed disclosures to her, the victim's disclosures to the sexual assault nurse examiner ("SANE") at the hospital, the fact that the victims knew about each other's experiences, and because some of the victims were together when the abuse occurred. (Tr. 764.) McHugh testified that she also believed the children because they recounted "details about certain activities and devices that they shouldn't have known at their age[s]." (Tr. 783.) For example, Victim 2 told her that D.S. used a pump to "pump his penis up." (Tr. 784.) Victim 1 also testified that she observed D.S. use the penis pump. (Tr. 1223, 1237-1240.)

{¶ 9} Brandalyn Kemp, the children's therapist, testified that she began counseling the victims in April 2019, shortly after they were taken into custody. (Tr. 825.) Kemp testified that all three victims suffered from severe anxiety, flashbacks, and nightmares and that, based on their symptoms, she diagnosed all three of them with posttraumatic stress disorder ("PTSD"). (Tr. 835.)

> All three victims provided similar testimony. The victims explained that the abuse episodes usually began when D.S. ordered one of them to go upstairs to his bedroom and remove her clothes. The girls

testified that D.S. "greased" his penis with vegetable oil or Vaseline before inserting it into their vaginas. (Tr. 866-867, 894.) They also separately told Hackett that he regularly used Vaseline before sex. (Tr. 1101, 1105, 1125.) Detective Timothy Clark, a special investigator with the Cuyahoga County Prosecutor's Office, authenticated several nude pictures of one of the victims and testified that an open jar of Vaseline was depicted in several of the pictures.

(Tr. 1348, 1496-1497.)

{¶ 10} Victim 2, who was 13 years old at the time of trial, testified that D.S. sometimes used a penis pump before raping her. She explained that he would "put it on his private part and he'd have to hold the knob and press on it, and then it would do something to his private part." (Tr. 853.) According to Victim 2, D.S. kept the pump in a bag under clothes in his dresser. (Tr. 855.) Victim 2 also identified "rubber bands" that he put on his penis to prevent her from getting pregnant. (Tr. 855-856.)

{¶ 11} Victim 2 testified that sometimes D.S. "put his penis in [her] private part," and sometimes he made her "suck his penis." (Tr. 859, 860.) Victim 2 explained that the term "private part" refers to either D.S.'s penis or her vagina. (Tr. 853, 859.) When she sucked his penis, "white stuff came out." (Tr. 860.) When asked how often D.S. made Victim 2 do these things, she replied that it "happened mainly every day" since she was seven years old. (Tr. 861.)

{¶ 12} Victim 2 described a time when D.S. raped her and her sister, Victim 1, simultaneously. She stated:

We both had our clothes off and he put, first he had put his penis into my private part and then he was like, while he was doing that, he was putting his fingers into my big sister's private part.

(Tr. 862.)  She further explained that D.S. "took turns" doing this: "first it was mine and then it was my big sister and then it would go back to me."  (Tr. 862.)  D.S. told the girls he would kill them if they told their mother about the abuse.  (Tr. 863.)  According to Victim 2, D.S. also took pictures of her in a state of nudity.  (Tr. 895.)

{¶ 13} Victim 3, who was 12 years old at the time of trial, testified that D.S. often choked her and told her that he hates her.  (Tr. 987, 990.)  She explained that she could not breathe when he choked her and sometimes the choking caused bruises.  (Tr. 990-991.)  D.S. beat Victim 3 and her sisters with a belt, and the belt left marks on her body.  (Tr. 992-994.)

{¶ 14} Victim 3 testified that D.S. first started assaulting her when she was 11 years old.  First, he put his fingers in her vagina, but later put his penis "in [her] butt."  (Tr. 998-999.)  Other times, D.S. put his penis in Victim 3's mouth.  (Tr. 1005, 1050.)  D.S. also used his phone to take several pictures of Victim 3 naked.  (Tr. 1009.)  Victim 3 testified that D.S. put his fingers in her vagina "more than one time," put his penis in her vagina "more than one time," put his penis "in her butt * * * more than one time," and put his mouth on her vagina "sometimes."  (Tr. 1018, 1050.)

{¶ 15} Victim 1 testified that D.S. first started sexually abusing her when she was five years old and they lived in their old house as opposed to their current residence.  During the first incident, D.S. woke Victim 1 up while she was sleeping and placed his penis in her mouth.  (Tr. 1202.)  Victim 1 testified that when she was seven years old, D.S. put his penis "in [her] butt."  (Tr. 1214-1215.)  Victim 1

explained that the abuse happened "every so often" when she was younger and more frequently as she got older. (Tr. 1204, 1242.)

{¶ 16} Most of the abuse occurred in the family's current home. Victim 1 testified that D.S. anally raped her twice when she was 12 years old. (Tr. 1242-1243.) She testified that on other occasions, "he stuck his private part in [her] private part," and that he sometimes rubbed her breasts under her clothes and over her clothes. (Tr. 1206, 1244.) Victim 1 testified that the word "private" referred to his penis and her vagina. (Tr. 1201-1202, 1206.)

{¶ 17} According to Victim 1, D.S. also took pictures of Victim 1 with her clothes off "at least three times." (Tr. 1251.) He told her to "do certain poses" when he took the pictures and showed them to her before deleting them. (Tr. 1252.) He told Victim 1 that he deleted the pictures so that Mother "wouldn't find out." (Tr. 1253.) Victim 1 knew when her sisters were being abused and now suffers from flashbacks, nightmares, and trouble sleeping. (Tr. 1257, 1262.) Victim 1 testified that D.S. last raped her the night before Mother reported the abuse to the police in April 2019.

{¶ 18} Kathleen Hackett ("Hackett"), the SANE nurse at Rainbow Babies and Children's Hospital, who examined the victims, testified that when a victim is regularly assaulted once a week or once every two weeks, it is difficult for the victim to remember every detail of the event because victims tend to disassociate from the experiences. (Tr. 1089.) There are also other issues that could impair a victim's ability to remember the details of such a traumatic event. (Tr. 1089.)

{¶ 19} Hackett also explained that nonfatal strangulation often occurs during sexual assaults. (Tr. 1094.) A strangulation event prevents memories from being formed because the brain is deprived of oxygen. Hackett also explained that the loss of oxygen that occurs during strangulation can "cause long-term health consequences such as strokes, miscarriages and all of that." (Tr. 1131.)

{¶ 20} According to Hackett, all three victims separately reported that the abuse occurred often, that D.S. threatened to kill them if they told anyone, that he choked them, and that he took pictures of the girls naked. (Tr. 1102, 1123, 1124.) Victim 3 told Hacket that "one time * * * [D.S.] stuck his finger up my vagina and made it bleed." (Tr. 1131.)

{¶ 21} Clark testified that he extracted photographs from D.S.'s LG smartphone. Clark authenticated several photographs extracted from the phone that depicted the victims without any clothes. (Tr. 1344-1350.) Some of the photographs he identified were taken on April 7, 2019, three days before Mother reported the abuse to police.

{¶ 22} After the state rested, the defense called Mother to testify. Mother testified that the victims were born in 2004, 2006, and 2007. Thereafter, she asserted her Fifth Amendment right against self-incrimination and refused to answer any other questions.

{¶ 23} D.S. testified on his own behalf and claimed that he has had difficulty maintaining an erection ever since he was injured in a bicycle accident in 2005. He claimed that he took Viagra and Cialis for erectile dysfunction, but they did not work.

His doctor later prescribed a penis pump, and D.S. claimed the penis pump did not work either. (Tr. 1662-1663.) He denied he ever assaulted any of the victims and asserted that he was telling the truth and they were lying. (Tr. 1678, 1706.)

{¶ 24} However, on cross-examination, D.S. admitted that even though he suffered from erectile dysfunction since 2005, he fathered two children who were born in 2006 and 2007. He also admitted that he had vaginal sex with his wife until 2009. When the prosecutor confronted D.S. with condoms seized by police during the search of his home, he admitted that he kept them so as not "to get anyone pregnant." (Tr. 1713.) When asked why he would need condoms if he could not get an erection, he explained that he kept them "[f]or back up, just in case." (Tr. 1713.) D.S. also admitted that he had three firearms even though he was prohibited from possessing firearms due to his prior aggravated robbery and felonious assault convictions. (Tr. 1716-1717.)

{¶ 25} D.S. acknowledged that he "spanked" the victims with a belt and that CCDCFS had previously investigated him after the children went to school with marks on their bodies. (Tr. 1718, 17211, 1724.) At first, he denied he hit the children, but later admitted that he left marks on their bodies, stating "Yes, I had a heavy hand." (Tr. 1725.)

{¶ 26} The prosecutor confronted D.S. with photographs of the victims not wearing any clothes. He disclaimed the pictures, stating "I can't look at my babies like this." (Tr. 1727.) D.S. then denied knowing how the pictures got on his phone. (Tr. 1733.)

{¶ 27} Finally, D.S. admitted on cross-examination that he continued to take Viagra and Cialis though 2019 and never complained to his doctor of erectile dysfunction until July 2019, after he was arrested and charged with the offenses in this case. (Tr. 1751.)

{¶ 28} Based on the evidence presented at trial, the jury found D.S. guilty of all counts in the indictment. The court further found him guilty of notice of prior conviction, repeat violent offender, and sexually violent predator specifications. D.S. was sentenced to life in prison without the possibility of parole. He now appeals his convictions.

## II. Law and Analysis

### A. Manifest Weight of the Evidence

{¶ 29} In the first assignment of error, D.S. argues his convictions are against the manifest weight of the evidence because the victims' testimony was not credible. He contends the victims' testimony was inconsistent, that they have a reputation for lying, and that they wanted to get rid of their father so that their mother could take his money.

{¶ 30} The criminal manifest-weight-of-the-evidence standard addresses the evidence's effect of inducing belief. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). In a manifest-weight-of-the-evidence analysis, "a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25. The reviewing court must consider all the evidence in the record, the reasonable

inferences, and the credibility of the witnesses to determine "'whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983).

{¶ 31} In conducting such a review, the Ohio Supreme Court has stated that the appellate court "sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of conflicting testimony." *Id.* at 546-547, quoting *Tibbs v. Florida*, 457 U.S. 31, 45, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). The Supreme Court's characterization of the appellate court as a "thirteenth juror" refers to the appellate court's "'discretionary power to grant a new trial.'" *Id.* at 547, quoting *Martin* at 175. As a "thirteenth juror," the appellate court may disagree with the factfinder's resolution of the conflicting evidence and, in effect, create a deadlocked jury, which requires a new trial.

{¶ 32} However, our status as a "thirteenth juror" is not equal to that of the other twelve jurors, who are uniquely positioned to view the witnesses' demeanor, gestures, facial expressions, and voice inflections. These outward behaviors are not evident in a written transcript. Demeanor is not what the witness says, but the manner in which he or she says it. Demeanor evidence is invaluable in assessing a witness's credibility, yet it is totally lost in transmission to the court of appeals. It is for this reason that "the weight to be given the evidence and the credibility of the

witnesses are primarily for the trier of facts." *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.

{¶ 33} As previously stated, D.S. contends the victims' testimony was inconsistent and that they have a reputation for lying. However, D.S. does not identify any evidence to support his assertion that the victims had a reputation for lying. Although Victim 3 told McHugh that D.S. choked her while he raped her and stated at trial that he did not choke her while raping her, she testified that D.S. frequently choked her and raped her. (Tr. 988, 996, 998, 999, 1005, 1006-1007.) Her sisters separately corroborated the fact that D.S. physically beat and choked Victim 3 more than the other two victims. (Tr. 871, 1195.)

{¶ 34} Moreover, the victims separately and independently described D.S.'s abusive behavior and each victim's separate description was consistent with the others' descriptions. D.S. regularly ordered each victim to go upstairs into his bedroom, told her to take her own clothes off, and then raped them. They all three reported that D.S. "greased" his penis with Vaseline or vegetable oil before inserting his penis into their vaginas. (Tr. 866-867, 1101, 1105, 1125.) Some of photographs extracted from D.S.'s phone depicting the victims in a state of nudity also showed an open jar of Vaseline on the bed, which further corroborated the victims' testimony.

{¶ 35} Two of the victims testified that D.S. used a penis pump before he had sex. (Tr. 853-854, 1220.) The victims had identical descriptions of the pump, the bag D.S. stored it in, and the drawer he kept it in. (Tr.853, 1218.) When shown the pump seized from D.S.'s drawer during the search of the house, both victims

identified the pump as the one they were describing. The victims also reported D.S.'s use of the penis pump to McHugh. (Tr. 783.) McHugh testified that the victims would not normally have knowledge of penis pumps at their age. (Tr. 816.) Indeed, D.S., himself, acknowledged that the penis pump belonged to him. (Tr. 1662, 1708, 1711-1712.)

{¶ 36} The three victims were each diagnosed with PTSD as a result of trauma they experienced. Kemp testified that she diagnosed them with PTSD based on their symptoms, which invariably included "severe anxiety, flashbacks, and nightmares." (Tr. 834.) The victims themselves also testified that they suffered from these symptoms. (Tr. 890, 1017, 1262.)

{¶ 37} D.S. nevertheless argues that his illegal use of a minor in nude material or performance convictions are not supported by the weight of the evidence because someone else could have taken the pictures. However, all three victims testified that D.S. took nude photographs of them on his phone. (Tr. 895, 957, 960, 1009, 1251.) They also consistently stated that after taking the pictures, D.S. deleted them because he did not want Mother to see them. (Tr. 896, 1047, 1253.) When shown the cell phone that Clark extracted the photographs from, all three victims identified the phone as the phone D.S. used to take naked photographs of them. (Tr. 897, 1010, 1254.)

{¶ 38} D.S. contends the victims lied about the abuse in order to get rid of him and take his money. However, two of the victims testified that despite the abuse, they still love D.S. (Tr. 920, 1019.) And, other than the fact that D.S. had

some money saved in the bank, there is no evidence that the children were motivated to lie in order to get his money.

{¶ 39} The jury listened to the witnesses; observed their demeanor, gestures, and voice inflections; and used these observations to assess their credibility and determined the victims were credible. Although there were a few discrepancies between what Victim 3 reported to investigators and her testimony at trial, we find nothing in the record to suggest that the jury lost its way and created such a manifest miscarriage of justice that D.S.'s convictions must be reversed and a new trial ordered.

{¶ 40} The first assignment of error is overruled.

## B. Sufficiency of the Evidence

{¶ 41} In the second assignment of error, D.S. argues the evidence was not legally sufficient to sustain his convictions. D.S. does not dispute that evidence was presented to support each of his convictions. He argues that the victims' testimony is not enough to support his convictions because they lacked credibility and offered "varying accounts." (Appellant's brief p. 16.)

{¶ 42} However, credibility is not a factor in the sufficiency analysis. "[T]he test for sufficiency requires a determination of whether the prosecution met its burden of production at trial." *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have

found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

## 1. Rape

{¶ 43} D.S. was convicted of 13 counts of rape in violation of R.C. 2907.02(A)(1)(b), which states that "[n]o person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." R.C. 2907.01(A)(1) defines "sexual conduct" as

> vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body * * * into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

{¶ 44} Victim 2 turned 13 years old in May 2006, and D.S. was arrested in April 2019. Therefore, because D.S. was arrested before Victim 2's 13th birthday and no further abuse occurred after his arrest, all of the abuse she described at trial occurred when she was under the age of 13.

{¶ 45} Although Victim 2 testified that D.S. raped her "mainly every day," she also described several specific incidents of rape. On one occasion, D.S. forced her to suck his penis. Victim 2 explained that on this particular occasion, "[t]here was white stuff coming out and that [she] had to swallow it." (Tr. 860.) Another time, D.S. simultaneously raped Victim 2 and Victim 1 She explained that while D.S. was vaginally raping her, he digitally penetrated Victim 1's vagina. He then switched and vaginally raped Victim 1 while digitally penetrating Victim 2. (Tr. 862.)

{¶ 46} Victim 2 testified that one day, after raking leaves, she went into the house to use the bathroom. D.S. followed her into the bathroom, rubbed her breasts and forced her to suck his penis. (Tr. 865.) According to Victim 2, D.S. did not ejaculate this time. (Tr. 866.) On a different day, D.S. told Victim 2 to go to his bedroom where he "greased" his penis and vaginally raped her on the bed. While they were having sex, Mother pulled into the driveway and D.S. quickly put his clothes back on and sprayed air freshener in the room. (Tr. 868.)

{¶ 47} Victim 2 testified that D.S. vaginally raped her and put his fingers in her vagina during another incident in D.S.'s bedroom. She explained that while she was cleaning, D.S. told her to go to his room and take off her clothes. After he raped her, Victim 2 stated that her mother was home, and D.S. slapped her across the face so hard that he left red marks on her face. (Tr. 869.) One time, D.S. handcuffed her to the bed and raped her. (Tr. 875.) And another time, he raped her on the table in the living room. (Tr. 895.) Thus, Victim 2 testified that D.S. raped her at least seven times while she was under 13 years of age.

{¶ 48} Victim 3 was 12 years old at the time of trial and was, therefore, also under 13 years of age when D.S. abused her. Like Victim 2, Victim 3 testified that D.S. raped her numerous times since she was eight or nine years old. (Tr. 987.) She stated that D.S. raped her vaginally, anally, and with his fingers. (Tr. 996, 998, 999.) She explained that he raped her in her bedroom, her sister's bedroom, and in his bedroom. (Tr. 998.) She also stated that D.S. put his penis in her mouth "more than

one time." (Tr. 1007.) Therefore, according to Victim 3's testimony, D.S. raped Victim 3 at least five times.

{¶ 49} Victim 1 testified that D.S. also repeatedly raped her over the period of several years. She stated that she was five years old and living in their old house when the abuse began. (Tr. 1198.) She explained that she was sleeping and her mother was at work when D.S. entered her bedroom and put his penis in her mouth. (Tr. 1202.) Victim 1 further stated that D.S. anally raped her once when she was seven years old and twice when she was 12 years old. (Tr. 1242-1243.) According to Victim 1, D.S. anally raped her "more than five times." (Tr. 1215.) Thus, Victim 1 described at least four different incidents of rape that occurred when she was under 13 years of age. However, he also vaginally raped her after she reached 13 years of age. (Tr. 1205-1206, 1214-1215.)

{¶ 50} Victim 2 provided sufficient evidence that D.S. raped her at least seven times when she was under 13 years of age. Victim 3 provided sufficient evidence that D.S. raped her at least five times while she was under 13 years of age. And Victim 1 provided sufficient evidence that D.S. raped her at least four times while she was under the age of 13. Therefore, there was sufficient evidence to support a finding that D.S. committed 13 counts of rape of a child under 13 years of age.

## 2. GSI

{¶ 51} D.S. was convicted of three counts of gross sexual imposition in violation of R.C. 2907.05(A)(4). To prove gross sexual imposition in violation of R.C. 2907.05(A)(1), the state had to prove that D.S. had sexual contact with a child

under the age of 13.  R.C. 2907.01(B) defines "sexual contact" as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person."  R.C. 2907.01(B).

{¶ 52} Victim 2 testified that during at least two incidents of rape, D.S. rubbed her breasts either before or during the actual rape.  (Tr. 865, 894-985.) Victim 3 testified that D.S. "sometimes" put his mouth on her vagina.  (Tr. 1050.) Victim 1 testified that D.S. often touched her naked buttock and rubbed his penis on her naked buttock.  (Tr. 1212.)  Therefore, there was sufficient evidence to support three GSI convictions.

### 3.  Minor in Nude Material or Performance

{¶ 53} D.S. was convicted of ten counts of illegal use of a minor in nude material or performance in violation of R.C. 2907.323(A)(2), which states, "[n]o person shall * * * photograph the person's child * * * who is a minor * * *, in a state of nudity * * * ."

{¶ 54} All three victims testified that D.S. routinely took pictures of them in a state of nudity.  (Tr. 895-896, 1009, 1133.)  Clark testified that he used a program called Cellebrite to extract data from D.S.'s LG smart phone.  He identified over ten photographs that were extracted from D.S.'s phone and testified that two naked girls were depicted in them.  (Tr. 1340-1341, 1351, 1360.)  D.S., himself, verified naked pictures of his daughters, exclaiming "I can't look at my babies like this."  (Tr. 1727.) After identifying that Victim 2 and Victim 1 were depicted in the photographs, D.S.

complained: "I don't want to look at the photograph. I don't want to look at my daughter." (Tr. 1732.) Therefore, there was sufficient evidence to support ten counts of illegal use of a minor in nude material or performance.

### 4. Child Endangering

{¶ 55} D.S. was convicted of three counts of child endangering in violation of R.C. 2919.22(B)(1), which states that no person shall "torture or cruelly abuse" a child under 18 years of age.

{¶ 56} The rape of a child is a form of child-sexual abuse. *See, e.g., State v. Butts*, 8th Dist. Cuyahoga No. 108381, 2020-Ohio-1498. And since we have already determined that there was sufficient evidence to support at least 13 counts of rape against three children under the age of 13, there is sufficient evidence that he cruelly abused three children under the age of 18. Therefore, there was sufficient evidence to support D.S.'s three child endangering convictions.

### 5. Having Weapons While Under Disability

{¶ 57} D.S. was charged with three counts of having weapons while under disability in violation of R.C. 2923.13(A)(2). R.C. 2923.13(A)(2) states, in relevant part, that "no person shall knowingly acquire, have, carry, or use any firearm * * * if * * * [t]he person * * * has been convicted of any felony offense of violence[.]"

{¶ 58} D.S. admitted on cross-examination that he possessed three firearms even though he had previously been convicted of violent offenses. (Tr. 1717.) Indeed, D.S. admitted that he possessed the guns illegally. (Tr. 1717.) Therefore,

there was sufficient evidence to support D.S.'s three having weapons while under disability convictions.

### 6. Attempted Rape

{¶ 59} D.S. was convicted of three counts of attempted rape in violation of R.C. 2907.02(A)(1)(b).  Two counts were allegedly committed against Victim 2 and one count was allegedly committed against Victim 3

{¶ 60} As previously stated, R.C. 2907.02(A)(1)(b) prohibits one from engaging in sexual conduct with a child under the age of 13.  R.C. 2907.01(A) defines "sexual conduct" as:

> vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

{¶ 61} In Counts 14 and 15, the indictment alleges that D.S. attempted to rape Victim 2 by way of fellatio and vaginal intercourse.  In Count 25, the indictment alleges that D.S. attempted to rape Victim 3 by way of fellatio.  Apart from the successful attempts where rape actually occurred, we find no evidence of unsuccessful attempts to rape Victim 3   We also find no evidence that D.S. attempted, but failed to vaginally rape Victim 2

{¶ 62} However, Victim 2 described at least one instance where D.S. attempted to have her perform fellatio, but the attempt was not successful.  Victim 2 was sleeping in her sister's room when she was awakened by the sound of D.S.

entering the bedroom. Victim 2 explained that D.S. "was turning to suck my private part while I was trying to do his." (Tr. 891.) Victim 2 described attempts to "suck" D.S.'s penis, but she never stated that his penis actually entered her mouth. (Tr. 891-893.) Therefore, her testimony supports one count of attempted rape as alleged in Count 14 of the indictment.

### 7. Kidnapping

{¶ 63} D.S. was convicted of kidnapping Victim 2 in violation of R.C. 2905.01(A)(4). R.C. 2905.01(A)(4) as alleged in Count 12 of the indictment. The indictment included a furthermore clause alleging that Victim 2 was under 18 years of age at the time of the offense.

{¶ 64} R.C. 2905.01(A)(4) provides, in relevant part:

No person, by force, threat, or deception, or, in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:

* * *

(4) To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will[.]

{¶ 65} R.C. 2907.01(C) defines "sexual activity" as "sexual conduct or sexual contact, or both." As previously stated, "sexual conduct" means

vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

R.C. 2907.01(A). The term "sexual contact" means "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶ 66} The Supreme Court of Ohio has held that "implicit within every forcible rape * * * is a kidnapping" because the victim's liberty is restrained during the act of forcible rape. *State v. Logan*, 60 Ohio St.2d 126, 130, 397 N.E.2d 1345 (1979). To establish the element of force in a rape case of a minor child, neither express threat of harm nor evidence of significant physical restraint need be proven if the defendant holds a position of authority over the child. *State v. Dye*, 82 Ohio St.3d 323, 695 N.E.2d 763 (1998), paragraph one of the syllabus. The adult's position of authority and power in relation to the child's vulnerability creates a unique situation of dominance and control in which explicit threats and displays of force are unnecessary. *State v. Eskridge*, 38 Ohio St.3d 56, 526 N.E.2d 304 (1988), paragraph one of the syllabus.

{¶ 67} As Victim 2's father, D.S. held a position of authority over Victim 2, particularly in light of her young age. And since there was sufficient evidence to establish that D.S. raped Victim 2 at least seven times, there was sufficient evidence to support at least one count of kidnapping.

### 8. Felonious Assault

{¶ 68} D.S. was convicted of two counts of felonious assault in violation of R.C. 2903.11(A)(1). R.C. 2903.11(A)(1) states that "[n]o person shall knowingly * * *

[c]ause serious physical harm to another."  The term "serious physical harm" is defined as:

> (a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;
>
> (b) Any physical harm that carries a substantial risk of death;
>
> (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;
>
> (d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;
>
> (e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

R.C. 2901.01(A)(5)(a)-(e).

{¶ 69} The state maintained that D.S. committed felonious assault by choking Victim 3 on multiple occasions.  Indeed, Victim 3 testified that D.S. choked her "sometimes."  (Tr. 987.)  However, in order for choking to constitute felonious assault, the victim must sustain "serious physical harm."  In cases where choking constituted felonious assault, the victim lost consciousness and the loss of consciousness met the serious physical harm element of felonious assault.  *See State v. Revere*, 8th Dist. Cuyahoga No. 108386, 2020-Ohio-572, ¶ 22, citing *State v. Chambers*, 8th Dist. Cuyahoga No. 99864, 2014-Ohio-390, ¶ 23 (Temporary loss of consciousness constitutes a temporary substantial incapacity, and, therefore, serious physical harm.);  *see also State v. Redwine*, 12th Dist. Brown No. CA2006-08-011, 2007-Ohio-6413, ¶ 32 (concluding that "[l]osing consciousness as a result

of an assault constitutes serious physical harm"); *State v. Booker*, 2d Dist. Montgomery No. 22990, 2009-Ohio-1039, ¶ 16 (concluding that "[t]emporary unconsciousness constitutes a temporary substantial incapacity, and therefore serious physical harm"); *State v. Waugaman*, 5th Dist. Richland No. 18CA18, 2019-Ohio-1102, ¶ 29 (A loss of consciousness due to choking would support a finding of serious physical harm.  A loss of consciousness, irrespective of its duration, satisfies the definition of "temporary, substantial incapacity."); *State v. Wimpey*, 6th Dist. Lucas No. L-18-1262, 2019-Ohio-4823, ¶ 23 ("Being rendered unconscious, no matter how brief, qualifie[s] as a 'temporary substantial incapacity,' which satisfie[s] the serious physical harm requirement."); *State v. McSwain*, 8th Dist. Cuyahoga No. 83394, 2004-Ohio-3292, ¶ 29 ("Unconsciousness is a state of temporary, substantial incapacity sufficient to constitute serious physical harm.").

**{¶ 70}** Since there is no evidence that Victim 3 ever lost consciousness when D.S. choked her, these acts of choking, by themselves, do not constitute felonious assault.

**{¶ 71}** However, as previously stated, "serious physical harm" includes "[a]ny mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment."  R.C. 2901.01(A)(5)(a).  In *State v. Cooper*, 139 Ohio App.3d 149, 743 N.E.2d 427 (12th Dist.2000), the defendant was convicted of four counts of felonious assault in violation of R.C. 2903.11(A)(1).  Each of the four counts was based on the defendant's abusive treatment of her four children over a period of time that resulted in each child developing a mental illness.  *Id.* at 158.  The

defense argued the trial court should have dismissed all four of the felonious assault charges because a single felonious assault charge could not be based upon numerous acts occurring over the course of many years. The court in *Cooper* rejected that argument, explaining that "R.C. 2903.11(A)(1) does not mandate that a defendant perform a single act in order to commit the crime of felonious assault by causing a single injury in the form of mental illness." *Id.* at 160.

{¶ 72} In this case, all three victims were diagnosed with PTSD and required ongoing psychiatric treatment as a result of D.S.'s abusive conduct. Therefore, there was sufficient evidence to support at least two counts of felonious assault.

{¶ 73} Having determined that there was insufficient evidence to support two attempted rape convictions but that there was sufficient evidence to support the remaining convictions, we sustain the second assignment of error in part and overrule it in part.

## C. Ineffective Assistance of Counsel

{¶ 74} In the third assignment of error, D.S. contends his convictions should be reversed because his Sixth Amendment right to the effective assistance of counsel was violated.

{¶ 75} D.S.'s trial counsel stated on the record at the end of trial that he thought his performance was ineffective because he had trouble hearing. D.S. now contends his trial counsel was ineffective and that his right to a fair trial was prejudiced because his trial counsel could not hear.

{¶ 76} To establish ineffective assistance of counsel, the defendant must demonstrate that counsel's performance fell below an objective standard of reasonable representation and that he or she was prejudiced by that deficient performance. *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Prejudice is established when the defendant demonstrates "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

{¶ 77} Although counsel stated on the record that he thought his performance was deficient, we find no evidence of deficient performance. D.S. asserts his trial counsel could not hear the witnesses, but this assertion is not supported by the record. The trial court allowed counsel to sit closer to the witnesses so he could hear them, and the record reflects that he was wearing his hearing aids. D.S. does not identify anywhere in the record establishing that counsel could not hear, nor does he identify any specific places in the record where counsel's performance was deficient as a result of poor hearing. Counsel thoroughly cross-examined the state's witnesses and objected appropriately throughout the trial, which indicates that counsel could hear. We, therefore, cannot say that D.S. was prejudiced because his counsel was hearing impaired and could not hear.

{¶ 78} The third assignment of error is overruled.

{¶ 79} The trial court's judgment is affirmed in part. Counts 15 and 25, alleging attempted rape, are vacated due to insufficient evidence.

It is ordered that appellant and appellee share costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

 

_____
EILEEN T. GALLAGHER, JUDGE

LARRY A. JONES, SR., P.J., and
MICHELLE J. SHEEHAN, J., CONCUR