[Cite as *State v. Beasley*, 2025-Ohio-4463.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                                 :

    Plaintiff-Appellee,                 :

                                          No. 114589

    v.                                              :

ALONTEZ BEASLEY,                          :

    Defendant-Appellant.             :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART; VACATED IN PART
**RELEASED AND JOURNALIZED:** September 25, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-692857-B

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney and Kevin R. Filiatraut, Assistant Prosecuting Attorney, *for appellee*.

Cullen Sweeney, Cuyahoga County Public Defender, Robert McCaleb, Assistant Public Defender, *for appellant*.

MARY J. BOYLE, J.:

{¶ 1} Defendant-appellant Alontez Beasley ("Beasley") appeals his convictions for aggravated murder and felonious assault. For the reasons set forth below, we affirm in part and vacate in part. Two of the felonious assault counts

(Counts 9 and 10) are vacated because there was insufficient evidence of serious physical harm related to two of the victims. The remaining counts and respective sentences are affirmed.

## I. Facts and Procedural History

{¶ 2} On June 18, 2024, Beasley along with his codefendants Jamar Skanes ("Skanes") and Clarence Bennett ("Bennett") were charged in connection with the murder of 29-year-old Alyson Appling-France ("the victim") and the felonious assaults of her 6- and 10-year-old daughters ("girls") and their driver Courtney Miller ("Miller"). The indictment charged them with aggravated murder, murder, felony-murder, conspiracy to commit murder, multiple counts of felonious assault, and having weapons while under disability. They were also charged with multiple three- and six-year firearm specifications. Although it was a joint trial, Beasley opted for a jury trial, while Skanes opted for a bench trial.[1] As of the date of this opinion, Bennett has not been apprehended.

{¶ 3} At trial, the evidence revealed that Beasley along with his codefendants Skanes and Bennett were hired to kill the victim. The evidence also demonstrated that the victim was stalked for several days before she was killed on January 10, 2024, in front of her girls and Miller. The evidence adduced at trial did reveal why the victim was the target or who hired Beasley and the codefendants to kill her.

---

[1] Skanes has appealed his convictions, and it is pending before this court. *State v. Skanes*, 8th Dist. Cuyahoga No. 114528.

**{¶ 4}** On the day of the murder, video evidence, which was played for the jury, depicts Beasley and Skanes arriving at the victim's townhouse complex on the west side of Cleveland in a black Ford pickup truck at approximately 9:30 a.m. (State's exhibit No. 805.) The two sat in the truck all day surveilling the victim, until approximately 4:00 p.m. when they went to a gas station for food and fuel. (State's exhibit No. 825.) Both of their faces were captured on camera at the gas station. (State's exhibit No. 823 and 828.) Approximately 50 minutes later, Beasley and Skanes returned to their hiding spot outside of the victim's townhouse. (State's exhibit No. 832.)

**{¶ 5}** The video evidence then reveals that shortly after Beasley and Skanes returned, the girls arrived home from school and exited the minivan driven by Miller. (State's exhibit No. 842.) A short time later, the victim and her girls exited the townhouse and entered the minivan. Miller drove them to a nearby Target and Giant Eagle, where they shopped. Beasley and Skanes followed the minivan to both locations. (State's exhibit No. 844.) At this point Bennett, who drove a white GMC Acadia SUV, joined the surveillance. The video evidence captures the victim and her girls walking right in front of Bennett's SUV just before they entered Target. (State's exhibit No. 851.) When the victim and her girls were shopping at Giant Eagle, Bennett waited in the adjacent GetGo parking lot, while Beasley and Skanes returned to their hiding spot outside of the victim's townhouse.

**{¶ 6}** The victim and her girls finished shopping just after 8:00 p.m., and Miller drove them home. Upon their return, the video evidence depicts the victim

exiting the minivan from the back passenger sliding door and attempting to retrieve her shopping bags. (State's exhibit No. 864.) The girls can be observed sitting in the third row of the minivan gathering their things, and Miller can be observed exiting the vehicle to help with the victim's shopping bags. The video then captures the victim looking to her left toward the back of the minivan for a brief moment, then diving headfirst into the minivan. An individual can be observed running up to the minivan, leaning into the vehicle, and firing multiple rounds at the victim. The video further captures the girls in the back seat and Miller reentering the minivan and driving off. While Miller is calling 911 and attempting to leave the townhouse parking lot, the black pickup truck can be observed driving around the minivan and speeding off. (State's exhibit No. 868.)

{¶ 7} Two 911 calls were played for the jury. In one, a neighbor relays to dispatch that he heard "10 or 11" gunshots that "sounded like an automatic machine gun." (State's exhibit No. 701.) He reiterated that it sounded like "something automatic for sure." He told dispatch that he could hear people screaming, and he also described a loud truck speeding away.

{¶ 8} The second call is from Miller. In it, he frantically explains to dispatch that when he was dropping off the victim, she got shot in his car. Miller said a "guy ran up" and shot the victim and that Miller was driving the victim to the hospital. (State's exhibit No. 700.) He then puts the 10-year-old on the phone to give dispatch information about the victim. The 10-year-old relays that her "mommy just got shot" and "she's not breathing." (State's exhibit No. 700.) She describes the shooter

as wearing all black and dark skin. She said he shot her mom "like six times and ran off." She explains that Miller is her driver and has been driving them for over a year. She tells dispatch that her little sister, who is six, is in the backseat with her. Both girls can be heard crying throughout the call. When they arrive at the hospital and meet with police, the dispatcher disconnects the call.

{¶ 9} The medical examiner testified that the victim was shot 17 times, and 9 bullets were recovered from her body. He testified that 10 of the 17 shots were fatal. He explained that the victim would have died within seconds.

{¶ 10} Beasley, Skanes, and Bennett were identified as suspects through city and store surveillance cameras that surrounded the area. The videos detail the black pickup truck's and white SUV's movements throughout the day of the murder. Additionally, the cell phone data connected Beasley and Bennett. The data also confirmed their locations from January 5 to January 10 and multiple texts messages from Bennett to Beasley urge Beasley to get it done. On January 7, Bennett texts Beasley, "My N wanting to know what and why it didn't happen[?]" (Tr. 946.)

{¶ 11} Beasley and Skanes were arrested 16 days after the murder. The black pickup truck was recovered in a garage where Skanes lived, as well as the distinctive sweatshirt worn by Beasley. Forensic evidence revealed that Beasley's DNA was found on the minivan door frame where he placed his hand when he leaned in to kill the victim.

{¶ 12} Following the conclusion of trial, Beasley and Skanes were convicted on all counts, which included aggravated murder with prior calculation and design,

murder, felony-murder, conspiracy to commit murder, five counts of felonious assault, having weapons while under disability, as well as three- and six-year-firearm specifications. At sentencing, all of the murder counts and two of the felonious-assault counts related to the victim were merged into the aggravated-murder count, and Beasley was sentenced to 9 years on the firearm specifications consecutive to a sentence of life without parole on the aggravated-murder count. In addition, the trial court sentenced Beasley to 8-12 years on three of the felonious-assault counts, which was ordered to be served concurrently to each other but consecutively to the aggravated-murder count. The court also sentenced Beasley to 36 months for the having weapons while under disability count, which was ordered to be served concurrently to the felonious-assault counts. The trial court waived court costs.

{¶ 13} Beasley now appeals raising the following six assignments of error for review:

> **Assignment of Error I:** The trial court erred in denying [Beasley's] Rule 29 motion as to Counts 9 and 10 (charging him with the "serious physical harm" variant of felonious assault on [the girls]).

> **Assignment of Error II:** The trial court erred when it imposed consecutive sentences because it failed to make the required finding that consecutive sentences were necessary to protect the public, a finding that in any event would not have been supportable given the life sentence without parole.

> **Assignment of Error III:** The trial court erred in permitting the prejudicial and cumulative presentation of extremely gruesome photographs.

> **Assignment of Error IV:** [Beasley's] trial counsel rendered constitutionally ineffective assistance of counsel when he failed to

object to the presentation or admission into evidence many unnecessary and prejudicial gruesome photographs.

**Assignment of Error V:** The trial court erred in permitting a lay witness to offer what amounted to expert testimony about a firearm experiment he himself did not even perform; alternatively, the trial court erred in permitting an expert witness to testify without satisfying the requirements of Evid. R. 702 or Crim. R. 16(K).

**Assignment of Error VI:** It was error to impose an indefinite sentence on a count whose time was run consecutively to a count where a sentence of life imprisonment without parole was imposed.

## II. Law and Analysis

### Serious Physical Harm

{¶ 14} In the first assignment of error, Beasley asserts that his Crim.R. 29 motion for acquittal on Counts 9 and 10 charging him with felonious assault should have been granted because there was no evidence in the record that the victim's daughters suffered serious physical harm as defined by R.C. 2901.01(A)(5)(a). We find Beasley's argument persuasive.

{¶ 15} A Crim.R. 29(A) motion for acquittal tests the sufficiency of the evidence. *State v. Capp*, 2016-Ohio-295, ¶ 19 (8th Dist.). Crim.R. 29 mandates that the trial court issue a judgment of acquittal where the State's evidence is insufficient to sustain a conviction for an offense. *Id.*, citing *State v. Taylor*, 2014-Ohio-3134, ¶ 21 (8th Dist.). Accordingly, we review a trial court's denial of a defendant's motion for acquittal using the same standard we apply when reviewing a sufficiency-of-the-evidence claim. *Taylor* at ¶ 21-23 ("Crim.R. 29(A) and sufficiency of evidence review require the same analysis."), citing *Cleveland v. Pate*, 2013-Ohio-5571 (8th Dist.).

{¶ 16} When reviewing the sufficiency of the evidence, an appellate court must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 2009-Ohio-3598, ¶ 12 (8th Dist.). When performing a sufficiency inquiry, an appellate court does not assess whether the State's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *Thompkins*, at 387; *Jenks* at paragraph two of the syllabus. A sufficiency-of-the-evidence argument is not a factual determination, but a question of law. *Thompkins* at 386.

{¶ 17} In Counts 9 and 10, Beasley was charged with felonious assault under R.C. 2903.11(A)(1), which prohibits knowingly causing serious physical harm to another person. The girls were named as victims. Because neither girl was physically injured during the murder, the State maintains that there is sufficient evidence of serious physical harm as set forth in R.C. 2901.01(A)(5)(a) which defines serious physical harm to persons as "[a]ny mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment[.]"

{¶ 18} The State argued in the trial court as well as on appeal that it set forth sufficient evidence to prove a mental illness or condition of such gravity as would normally require hospitalization or prolong psychiatric treatment. This evidence

consisted of the girls, at the tender ages of six and ten, witnessing the brutal murder of their mother, having to call 911 to detail their location and their mother's condition, and watching their mother die. Beasley, however, cites several cases to support his argument that the State needs more than supposition to get past Crim.R. 29.

{¶ 19} Beasley relies on *State v. D.S.*, 2021-Ohio-1725 (8th Dist.), wherein the defendant was convicted of multiple counts of rape and felonious assault involving the sexual abuse of his three daughters. In *D.S.*, this court held that there was sufficient evidence to prove the victims suffered serious physical harm when their therapist testified that "all three victims were diagnosed with posttraumatic stress disorder ('PTSD') and required ongoing psychiatric treatment as a result of [defendant]'s abusive conduct." *Id.* at ¶ 72.

{¶ 20} Likewise, in *State v. Elliott*, 104 Ohio App.3d 812 (10th Dist. 1995), the defendant was convicted of felonious assault and child endangering for allowing his six-year-old son to discover his mother's dead body, after the defendant bludgeoned her to death. The son suffered PTSD as a result. Three psychologists and one psychiatrist testified, explaining the child's mental condition and the need for prolonged treatment. Defendant's expert testified that he was unsure whether the child needed prolonged treatment. Defendant argued on appeal that his convictions were against the manifest weight of the evidence and there was insufficient evidence that his son suffered serious physical harm because there was conflicting evidence as to whether the child's mental condition required "prolonged

psychiatric treatment." *Id.* at 819. The *Elliot* Court, however, found that the conflicting testimony "does not preclude reasonable minds from finding beyond a reasonable doubt that as a result of discovering his mother's body, [the child] suffered from a mental illness requiring prolonged psychiatric treatment." *Id.* The court held that "[t]he trial court's conclusion that [the child] suffered 'serious physical harm' is neither against the manifest weight of the evidence, nor unsupported by sufficient evidence." *Id.*

{¶ 21} Similarly, in *State v. Cooper*, 139 Ohio App.3d 149 (12th Dist. 2000), the defendant was convicted of four counts of felonious assault, among other things, for sexually abusing and allowing others to sexually abuse her four children, which caused her children's mental illness. The children each displayed "a variety of symptoms of mental illness." *Id.* Even though the expert could not separate the children's sexual abuse from their physical and emotional maltreatment as the cause of their mental illnesses, the court found that the trial court was not required to acquit, because from the expert's testimony a jury could reasonably find that "appellant caused 'serious physical harm' in the form of mental illness that is prohibited by the felonious assault statute." *Id.* at 161.

{¶ 22} In the cases set forth above, there was testimony at trial regarding the diagnosis of a mental condition or mental illness. Unlike the instant case, where the only evidence in the record regarding the girls is the 911 call and the videos that depict the girls witnessing their mother's murder. The State did not present any evidence regarding the girls' mental conditions. Additionally, the State did not cite

to any case supporting its proposition that the emotions of grief, fear, and sadness elevates to a mental condition of such gravity that would normally require hospitalization or prolonged psychiatric treatment. Nor can we find a case to support the conclusion that witnessing a horrific event, by itself, is sufficient evidence that the witness is suffering from a mental condition or mental illness. Although there is no doubt that the girls have suffered an unimaginable trauma, there is no evidence in the record to support "a mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment," as contemplated by the statute. Therefore, after viewing the evidence in a light most favorable to prosecution, we cannot say that the State met its burden of production as to the element of serious physical harm in Counts 9 and 10.

{¶ 23} Accordingly, Beasley's first assignment of error is sustained and Counts 9 and 10 are vacated.

**Consecutive Sentences**

{¶ 24} In Beasley's second assignment of error, he asserts that the trial court failed to make the required findings under R.C. 2929.14(C)(4) when ordering consecutive sentences on Counts 9-11 and 13. He further argues that consecutive sentences are not necessary to protect the public or to punish the offender when Beasley was sentenced to life without parole.

{¶ 25} Beasley acknowledges this court's decision in *State v. Chavez*, 2013-Ohio-4700 (8th Dist.), which held that sentences imposed consecutively to life-without-parole sentences have no practical legal meaning because "the defendant

can only be subjected to living out his or her life in prison once." *Id.* at ¶ 47. Thus, "[a]rguments about sentences imposed consecutively to life-without-parole are moot." *Id.* Nevertheless, Beasley encourages this court to review his sentence, arguing that our review is authorized under *State v. Porterfield*, 2005-Ohio-3095.

{¶ 26} This court, however, has rejected that same argument in *State v. Campbell*, 2016-Ohio-7613, ¶ 11 (8th Dist.). In *Campbell*, this court noted that the sentences in *Porterfield* were consecutive 20 years to life in prison, therefore it "did not necessarily foreclose the possibility, even if remote, of Porterfield serving those sentences and being paroled during his life." *Id.* at ¶ 11. Yet, a sentence of life without the possibility of parole, as is the case here, forecloses the possibility of parole because the "life sentence will be completed upon [the defendant's] death. When that occurs, the sentences that were ordered to be served consecutive to the life sentence will terminate." *Id.* Although we acknowledge Beasley's interest in preserving the issue for further review, we do not reach a different result here. *See also State v. Howell*, 2019-Ohio-3182, ¶ 31 (8th Dist.); *State v. Herrington*, 2018-Ohio-3049, ¶ 35-37 (8th Dist.). Beasley was sentenced to life without parole for aggravated murder; therefore, any error in the trial court's consecutive-sentencing findings is moot.

{¶ 27} Accordingly, Beasley's second assignment of error is overruled.

**Autopsy Photos**

{¶ 28} In Beasley's third assignment of error, he contends that the trial court abused its discretion by allowing numerous autopsy photos into evidence arguing

that the photographs were grisly, cumulative, and prejudicial. In his fourth assignment of error, Beasley asserts that his attorney was ineffective because he failed to object to the admission of the autopsy photographs. The State argues that the autopsy photographs were probative as to the manner of death, as well as Beasley's intent. We find the State's arguments more persuasive.

{¶ 29} Although the admission or exclusion of evidence rests within the sound discretion of the trial court, when there is no objection, we review under the plain-error standard. Crim.R. 52(B). Plain error is an obvious error in the trial court proceedings that affects the outcome of the trial. *State v. Rogers*, 2015-Ohio-2459, ¶ 22. The *Rogers* Court stated that the accused is "required to demonstrate a reasonable probability that the error resulted in prejudice — the same deferential standard for reviewing ineffective assistance of counsel claims." *Id.*, citing *United States v. Dominguez Benitez*, 542 U.S. 74, 81-83 (2004).

{¶ 30} To establish ineffective assistance of counsel, Beasley must demonstrate that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defendant so as to deprive him of a fair trial. *State v. Trimble*, 2009-Ohio-2961, ¶ 98, citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The failure to prove either prong of this two-part test makes it unnecessary for a court to consider the other prong. *State v. Madrigal*, 2000-Ohio-448, citing *Strickland* at 697. Therefore, Beasley must demonstrate that he was prejudiced by the admission of the autopsy photos.

{¶ 31} Beasley cites *State v. Maurer*, 15 Ohio St.3d 239, 264-266 (1984), *State v. Morales*, 32 Ohio St.3d 252, 259 (1987), and *State v. Watson*, 61 Ohio St.3d 1 (1991), as controlling authority that, according to him, limits the introduction of what he describes as "disgusting," "upsetting," and "macabre and grotesque" photographs to less than a handful at trial. Beasley's argument, however, is misplaced. *Maurer*, *Morales*, and *Watson* were capital murder cases, and the Ohio Supreme Court stated in *State v. Mammone*, that in the context of capital trials

> we have established "a stricter evidentiary standard" for admitting gruesome photographs and have "strongly caution[ed] judicious use." *State v. Morales*, 32 Ohio St.3d 252, 257-258, 259, 513 N.E.2d 267 (1987), citing *State v. Maurer*, 15 Ohio St.3d 239, 15 Ohio B. 379, 473 N.E.2d 768, at paragraph seven of the syllabus. A gruesome photograph is admissible only if its "probative value * * * outweigh[s] the danger of prejudice to the defendant." *Morales* at 258. Unlike Evid.R. 403, which turns on whether prejudice substantially outweighs probative value, this standard requires "a simple balancing of the relative values" of prejudice and probative value. *Id.* And even if a photo satisfies the balancing test, it can be "neither repetitive nor cumulative in nature." *Id.*; see *State v. Thompson*, 33 Ohio St.3d 1, 9, 514 N.E.2d 407 (1987).

*Id.* at ¶ 96.

{¶ 32} Accordingly, the admissibility of gruesome photographs in a noncapital case is considered under Evid.R. 403. *State v. Ransom*, 2024-Ohio-2634, ¶ 78-80 (8th Dist.), citing *Mammone* at ¶ 95-96, *Morales* at 257-258. Evid.R. 403(A) states that although relevant, exclusion of evidence is mandatory when "its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(B) states that although relevant, exclusion of evidence is discretionary when "its probative value

is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence."

{¶ 33} At issue in this case are 23 autopsy photos of the victim. The Ohio Supreme Court has held that autopsy photographs may be admitted into evidence "as an illustration of where a bullet enters the body and evidence of the resulting wound" and that such photographs are "probative of a purposeful killing." *State v. Goodwin*, 84 Ohio St. 3d 331, 342 (1999). Moreover, this court has held that autopsy photographs depicting a victim's injuries "[are] probative of the manner of death and [the defendant's] specific intent to kill." *State v. Shine*, 2018-Ohio-1972, ¶ 87 (8th Dist.), citing *State v. Craig*, 2006-Ohio-4571, ¶ 93.

{¶ 34} In this case, 17 of the photos depict the injuries the victim sustained after being shot 17 times at relatively close range with a 9 mm firearm. The medical examiner testified as to each entry and exit wound, as well as the target to muzzle distance from which each shot was fired. These photographs are not gruesome, nor are they repetitive. Six of the photos depict the bullets' path of entry and exit with orange rods. Relative to these six photos, the medical examiner explained how ten of the shots were fatal, and the rods illustrated the bullets' path of travel through the victim's body that destroyed vital organs. Although the photographs with the rods are uncomfortable to view, they are not gruesome, and they are relevant to show the extent of the victim's injuries and probative evidence of intent to cause death. In addition, each photo supported and illustrated the medical examiner's testimony.

{¶ 35} Nevertheless, Beasley maintains that "nobody disputed the cause, manner, location, or intentionality of the death in this case, [therefore] the photos bore little probative value," and was "heavily outweighed by other considerations." (Beasley brief, p. 19.) We note that even if Beasley had stipulated to the cause of death, it does not automatically render the photographs inadmissible. *Maurer*, 15 Ohio St.3d at 265. Moreover, "the [S]tate bears the burden of proof and it has no obligation to meet that burden in the least gruesome way." *Mammone*, 2014-Ohio-1942, ¶ 99. Finally, "Ohio courts have found that photographs may be used for a wide variety of purposes, including corroborating witness testimony, establishing the intent of the accused, and showing the nature and circumstances of the crime." *State v. Graham*, 2021-Ohio-3199, ¶ 40 (8th Dist.), citing *State v. Jalowiec*, 91 Ohio St. 3d 220, 230 (2001).

{¶ 36} After careful review, we find that the photos were not gruesome, repetitive, or cumulative and were relevant to establish the elements of murder and felonious assault as charged in the indictment. Therefore, the photographs were admissible under Evid.R. 403. Having found that the photos were properly admitted, we find that there is no plain error, nor was trial counsel ineffective for not objecting.

{¶ 37} Accordingly, Beasley's third and fourth assignments of error are overruled.

**Admission of Evidence**

{¶ 38} In the fifth assignment of error, Beasley maintains that Cleveland Police Homicide Detective Stephen Loomis ("Det. Loomis") either improperly testified as an expert without providing an expert report and proper foundation or he improperly testified beyond the scope of lay witness testimony. Beasley essentially contends that State's exhibit No. 703 — a video demonstration illustrating the difference between shooting a semiautomatic weapon versus an automatic weapon — was inadmissible. The State contends that this was demonstrative evidence that was properly admitted. We find that State's argument more persuasive.

{¶ 39} As noted above, the admission or exclusion of evidence rests within the sound discretion of the trial court. *State v. Sage*, 31 Ohio St.3d 173, 180 (1987). An abuse of discretion occurs when a court exercises "its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35. "Demonstrative evidence is admissible if it satisfies the general standard of relevance set forth in Evid.R. 401 and if it is substantially similar to the object or occurrence that it is intended to represent." *State v. Jones*, 2012-Ohio-5677, ¶ 82, citing *State v. LaMar*, 2002-Ohio-2128, ¶ 90. The admission of demonstrative evidence is also subject to Evid.R. 403, and "[t]he trial court has discretion to determine whether demonstrative evidence is helpful or misleading to the trier of fact." *Id.*, citing *State v. Cowans*, 87 Ohio St.3d 68, 77 (1999).

{¶ 40} In the case at bar, Beasley was charged with six-year firearm specifications, requiring that the State prove that Beasley used an automatic weapon in the commission of the offense. R.C. 2923.11(E) defines an "automatic firearm" as "any firearm designed or specially adapted to fire a succession of cartridges with a single function of the trigger." Whereas a "[s]emi-automatic firearm" is "any firearm designed or specially adapted to fire a single cartridge and automatically chamber a succeeding cartridge ready to fire, with a single function of the trigger." R.C. 2923.11(D).

{¶ 41} Det. Loomis, a thirty-year veteran of the Cleveland Police Department, testified he has experience with semiautomatic and automatic weapons. He explained that "[a] semi-automatic handgun shoots every time you pull the trigger, boom, boom, boom, boom, boom. As fast you can pull the trigger, that's as fast as that gun can shoot." (Tr. 841.) He further testified that an automatic weapon "allows you to pull [the trigger] one time and empty the magazine in a gun at a very, very rapid pace." (Tr. 841.) Det. Loomis testified that as part of his investigation, very experienced officers at the Cleveland Police shooting range conducted a demonstration showing how quickly a person can fire 17 rounds from an automatic as opposed to a semiautomatic weapon. He recorded the demonstration with his body camera, and it was played for the jury. (State's exhibit No. 703.) The video depicts one officer firing a semiautomatic handgun 17 times in 3.64 seconds, and another officer firing an automatic handgun 17 times in less than 1 second.

{¶ 42} Additionally, during Det. Loomis's testimony State's exhibit No. 702 was played for the jury. It was an audio recording of "ShotSpotter," which, according to civilian analyst Vesna Piscitello from the Cleveland Police Department's Real-Time Crime Center, "detects gunshots within a certain perimeter" in the city of Cleveland. (Tr. 492.) This recording captured the sound of the gunshots that rang out during the murder of the victim. The recording was less than one second long. This recording was also played for the neighbor who testified and identified it as the sound she and her husband heard the evening of the victim's murder. She testified that it sounded "automatic in nature." (Tr. 329.)

{¶ 43} Evid.R. 701 states that "[i]f the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue."

{¶ 44} After careful review of the record, we find that Det. Loomis's testimony was properly admitted as lay witness testimony and the demonstrative evidence was also properly admitted. Det. Loomis observed and recorded the demonstration that captured the differences between firing an automatic weapon and a semiautomatic weapon. The demonstration was helpful for the jury to determine a fact at issue in the trial, which was whether Beasley used an automatic weapon or a semiautomatic weapon. Det. Loomis did not opine that the ShotSpotter recording depicted an automatic weapon based on his experience or the

demonstration although he could have testified to such pursuant to Evid.R. 701. Instead, the State left the final factual conclusion to the jury, and the jury concluded that Beasley used an automatic weapon.

{¶ 45} Accordingly, Beasley's fifth assignment of error is overruled.

## Reagan Tokes and Life without Parole

{¶ 46} In the sixth assignment of error, Beasley suggests that it was error for the court to run an indefinite sentence under Reagan Tokes consecutive to a life-without-parole sentence that was imposed for aggravated murder. He claims that the statute does not explicitly allow these sentences to run consecutively and that it serves no purpose. In essence, Beasley contends that there is no reason to sentence him for the other crimes when he was sentenced to life without parole for aggravated murder.

{¶ 47} We note that a similar argument was raised and rejected by this court in *State v. Eggleton*, 2025-Ohio-1186 (8th Dist.), and we decline to depart from that precedent. Furthermore, it has long been held that "[a] 'blanket sentence' is not a valid sentence. [Therefore, a] trial court must impose a separate sentence on each count individually." *State v. Taylor*, 2019-Ohio-4352, ¶ 8 (8th Dist.), citing *State v. Goode*, 2018-Ohio-3594, ¶ 6 (8th Dist.); *see also State v. Saxon*, 2006-Ohio-1245, ¶ 9 ("Instead of considering multiple offenses as a whole and imposing one, overarching sentence to encompass the entirety of the offenses . . . a judge

sentencing a defendant pursuant to Ohio law must consider each offense individually and impose a separate sentence for each offense.").

{¶ 48} Accordingly, Beasley's sixth assignment of error is overruled.

{¶ 49} Judgment is affirmed in part and vacated in part. The convictions on Counts 9 and 10 are vacated.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
MARY J. BOYLE, JUDGE

EILEEN A. GALLAGHER, A.J., and
EILEEN T. GALLAGHER, J., CONCUR