[Cite as *State v. Abdu*, 2025-Ohio-5481.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 23AP-739 |
| v. | : | (C.P.C. No. 21CR-4997) |
| Othman A. Abdu, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on December 9, 2025

**On brief:** *Shayla D. Favor*, Prosecuting Attorney, and *Seth L. Gilbert*, for appellee. **Argued:** *Seth L. Gilbert*.

**On brief:** *Carpenter Lipps LLP*, *Kort Gatterdam*, and *Michael Rogers*, for appellant. **Argued:** *Michael Rogers*.

APPEAL from the Franklin County Court of Common Pleas

DORRIAN, J.

{¶ 1} Defendant-appellant, Othman A. Abdu, appeals from a judgment of the Franklin County Court of Common Pleas convicting him of felonious assault, aggravated murder, and murder along with specifications accompanying each count. For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} Appellant was charged for his alleged involvement in two shooting incidents that occurred on October 31, 2021.

{¶ 3} In the first incident, officers were dispatched to a residence regarding a shooting that had occurred. There, police learned that Trevon Gammons had been shot and they observed Gammons with a bandage on his arm. Police took photographs and

retrieved shell casings from the scene.  Gammons testified that he left his house and was walking near the corner of Wedgewood and Eakin streets when he heard shots and saw people running.  His arm was grazed by a bullet.  He did not see from where the bullets were fired or who fired the shots.

{¶ 4}    In the second incident, Nazeer Winton told his mother he was going outside of their apartment, which was in an area referred to as Rabbit Hill, to sell marijuana. Approximately 20 seconds later, Winton's mother heard gunshots, and she ran outside to find that Winton was on the ground.  Winton was administered CPR but ultimately died.

{¶ 5}    An arrest warrant for appellant was filed on November 17, 2021.  The next day, police posted on the department's Facebook page a picture of appellant with a notice that he was wanted for murder. On November 19, 2021, police responded to a suicide call involving appellant and, during that response, police learned that appellant was the subject of an arrest warrant and took him into custody.

{¶ 6}    During appellant's arrest, police obtained appellant's cell phone and turned it over to Columbus Division of Police Detective Chris Journey, the lead detective investigating the shooting that resulted in Winton's death.

{¶ 7}    On June 20, 2023, appellant filed a motion to suppress certain evidence. Relevant here, appellant sought to suppress evidence obtained from his iPhone, including the phone itself, its contents, and its cell site location data.

{¶ 8}    The court held a hearing on the motion to suppress.  Shawn Gruber, a sergeant for the Columbus Division of Police, testified that, during the early morning hours of November 19, 2021, he was called to respond to a suicide attempt but learned once on the scene that the individual, who he identified as appellant, had an arrest warrant for murder.  Sergeant Gruber testified that he conducted a pat down of appellant and took his cell phone pursuant to normal police procedures under the circumstances.  Sergeant Gruber eventually turned the phone over to Detective Journey and appellant was taken into custody and to the hospital.

{¶ 9}    Detective Journey also testified at the suppression hearing.  He stated that he requested warrants for appellant's cell phone, seeking both the contents of the phone and records from T-Mobile, appellant's wireless carrier.

{¶ 10} At the suppression hearing, the state announced that it did not intend to use at trial the extraction of data obtained as a result of the warrants.  It also noted that, on

August 4, 2023, five days before the suppression hearing, Detective Journey had obtained a new warrant for the phone's historical cell site location data (the "second warrant").

{¶ 11} On September 18, 2023, the trial court issued a decision which granted in part appellant's motion to suppress evidence. Relevant here, the trial court concluded that there was no probable cause for the issuance of appellant's arrest warrant or the search warrants for his cell phone and, further, that the "good faith, independent source, inevitable discovery, and exigent circumstances exceptions" did not apply. (Sept. 18, 2023 Decision & Entry at 15.) As a result, the trial court suppressed the evidence obtained as a result of the seizure of appellant's cell phone, including the search of its contents and the cell site location analysis conducted therefrom. The decision did not address the validity or impact of the second warrant relating to appellant's phone that Detective Journey had obtained.

{¶ 12} On September 28, 2023, appellant filed a motion in limine or, in the alternative, to suppress evidence obtained from the second warrant dated August 4, 2023, which sought T-Mobile records for appellant's phone, including cell site location data.

{¶ 13} At a hearing on this motion, Detective Journey testified that he requested the second warrant and, although he had knowledge of the contents of and prior cell site location analysis conducted on appellant's cell phone pursuant to the first warrant, he did not use that information when he prepared the affidavit for the second warrant. The state introduced as evidence the cell site location analysis report that was based on records obtained pursuant to the second warrant. The affidavit accompanying that report indicated that the analysis was conducted solely on records obtained pursuant to the second warrant and not on the prior analysis done with records obtained pursuant to the first warrant.

{¶ 14} On October 11, 2023, the trial court issued a decision denying appellant's motion to exclude or, in the alternative, to suppress the cell site location analysis report done with records obtained pursuant to the second warrant. The trial court declined to find that the records produced pursuant to the second warrant were a product of or were tainted by the illegality of the first seizure of appellant's cell phone and search of its contents that was the subject of its September 18, 2023, decision.

{¶ 15} The case proceeded to trial and the following additional facts were presented to the jury.

{¶ 16} After the shooting at Rabbit Hill, Winton's mother had contact with David Penton, Jr. who she identified as the last phone number with which Winton had

communicated prior to the incident. She testified that Winton had texted with Penton regarding a marijuana transaction. Penton told her he was at the scene but left with others when the shooting started. Eventually, Winton's mother spoke with Detective Journey and shared with him Penton's phone number.

{¶ 17} De'Neaja Johnson testified that, on October 31, 2021, she agreed to Penton's request that she drive him to ATMs in exchange for payment. She knew Penton because they had previously dated. She picked up Penton, then a friend of Penton's that she did not know but who she described as wearing an orange hoodie sweatshirt, and then another individual named Keisean Walker who she knew through Penton. Johnson testified that Penton directed her to drive somewhere around Wedgewood and to stop. She said she thought they were waiting for someone, but then shots came from her car and she drove off. Johnson said the shots came from behind her where the passenger with the orange hoodie was sitting.

{¶ 18} After leaving Wedgewood, Johnson drove the group to Walker's house and she sat in the car while the other three played basketball. She said she did not leave the group behind at that time because she was scared and believed one of them had a gun. After the three finished playing basketball, Johnson drove to a corner market. Johnson identified her car and the individuals with her in videos and still photos from the market. She noted that, when they left the store and got back into her vehicle, the individual with the orange sweatshirt sat in the passenger-side backseat of the car. Penton sat beside her in front and Walker sat behind her.

{¶ 19} After leaving the market, Johnson said the group wanted to buy marijuana and Penton directed her to drive to Rabbit Hill. Johnson testified that she saw the victim, Winton, leave his apartment and exchange words with Penton. She also heard Penton tell Walker to lay down. She said there were shots from the back passenger side of her car and the victim fell to the ground. She said the person wearing the orange sweatshirt was the only one she saw with a gun that day.

{¶ 20} After the shooting, Johnson said that Penton was acting fine but she was crying. Johnson dropped everyone off at Penton's home and left although Penton wanted her to take the others home.

{¶ 21} Walker testified that Penton was his best friend prior to the events on October 31, 2021. He knew Johnson through Penton. Walker testified that he knew the

individual in the car that wore an orange sweatshirt as "Ooze" through Penton.  Walker testified that the only one that had a gun on the day of the shootings was Ooze.  Walker testified he was sure that Penton did not have a gun.

{¶ 22} Walker said he was on his phone while they were driving through Wedgewood, but he looked up when he heard gunshots to see Ooze with a gun in his hand pulling his hand in the window.  Walker testified that, after playing basketball and going to a store together, they drove somewhere and he fell asleep in the car.  He woke up to the sound of gunshots and then the car "flying down the street."  (Oct. 19, 2023 Tr. Vol. IV at 44.)  He said he looked over and saw Ooze holding his right hand under his sweatshirt.

{¶ 23}  Penton testified[1] that appellant was the shooter on October 31, 2021.  He also testified that appellant was known as "Ooze" and wore an orange sweatshirt on the day of the shootings.  He said he and Ooze had talked about shooting Winton because Ooze told him there was a bounty for Winton.  Penton said he decided to help with killing Winton by texting him to set up a marijuana purchase.  He directed Johnson to drive them to Winton's place and then texted Winton to let them know they were there.  Penton explained, "He comes outside.  He comes to the car.  We shoot him."  (Tr. Vol. IV at 99.)  Penton said he looked back from where he was sitting in the car and saw Ooze shoot Winton through the open car window.  Penton testified that, after the shooting, he tried to cover for himself by texting Winton that he had left.

{¶ 24} Sean Taylor, a detective in the Digital Forensics Unit of the Columbus Division of Police, testified that he did a phone extraction on Penton's phone.  He noted that the phone contact information for the number assigned to "Oozie" had been changed to "Matt" on Nov. 2, 2021.  (Oct. 18, 2023 Tr. Vol. III at 110.)

{¶ 25}  Fingerprints from the vehicle's exterior above the rear passenger side door matched to appellant.  Testing on the shell casings collected from the two different shooting locations indicated that the casings were fired from the same firearm.

{¶ 26}  Detective James Howe, a police officer assigned to the Digital Forensics Unit, testified regarding the historical cell site location analysis that he conducted on appellant's phone with T-Mobile records obtained pursuant to the second warrant.  He explained that

---

[1] Penton was originally charged with murder, aggravated murder, and felonious assault. He signed an agreement with the state to plead guilty to involuntary manslaughter in exchange for his testimony and a recommended sentence of 15 to 18 and one-half years in prison.

historical cell site location analysis allows the investigator to match phone records with particular cell sites to get a general location of where a device associated with a particular phone number was at a certain time. Detective Howe testified that his report was targeted to appellant's phone number on the day of the shootings, October 31, 2021. He noted that there were no calls between 12:04 p.m. and 7:23 p.m. on October 31. In his report, Detective Howe determined that appellant's phone connected to a cell tower south of the Rabbit Hill incident location.

{¶ 27} The jury found appellant guilty of the counts charged: aggravated murder, two counts of murder, and felonious assault. The jury also found appellant guilty of the firearm specifications pursuant to R.C. 2941.145(A) and "Drive By Shooting" specifications pursuant to R.C. 2941.146(A) accompanying each count.

{¶ 28} The trial court merged the aggravated murder and murder counts for purposes of sentencing and the state elected to proceed on sentencing for aggravated murder. The trial court imposed an indefinite prison term of 8 to 12 years on the felonious assault count to be served concurrently to an indefinite prison term of 20 years to life imposed on the aggravated murder count. The trial court also imposed a 3-year mandatory prison term for each of the firearm specifications and a 5-year mandatory prison term on each of the "Drive By Shooting" specifications accompanying the counts for felonious assault and aggravated murder, as well as an additional 3-year prison term for the firearm specification accompanying one of the merged murder counts. The sentences imposed on the firearm specifications were ordered to be served consecutively to each other and consecutively to the terms for the underlying felony counts. The trial court calculated the aggregate indefinite prison term to be 39 years to life imprisonment.

{¶ 29} Appellant timely appealed.

## II. Assignments of Error

{¶ 30} Appellant assigns the following five assignments of error for our review:

> [I.] THE TRIAL COURT ERRED, CONTRARY TO THE FOURTH AMENDMENT AND ARTICLE ONE SECTION 14 OF THE OHIO CONSTITUTIONS GUARANTEEING THE RIGHT TO BE FREE OF UNLAWFUL SEARCH AND SEIZURES, WHEN THE COURT REFUSED TO SUPPRESS CELL SITE LOCATION DATA AND OTHER CELL PHONE RECORDS DUE TO THE INDEPENDENT SOURCE DOCTRINE.

[II.] THE TRIAL COURT ABUSED ITS DISCRETION AND DENIED APPELLANT A FAIR TRIAL AND DUE PROCESS BY ADMITTING REPETITIVE, GRUESOME PHOTOGRAPHS OF THE DECEASED AND ALLOWING REPEATED REFERENCES TO THE GORY NATURE OF THE CRIME SCENE.

[III.] THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE JURY TO VIEW ACCOMPLICE DE'NEAJA JOHNSON'S TESTIMONY WITH GRAVE SUSPICION. SAID ERROR DEPRIVED [APPELLANT] OF DUE PROCESS AND THE RIGHT TO A FAIR TRIAL UNDER THE OHIO AND UNITED STATES CONSTITUTIONS.

[IV.] THE TRIAL COURT VIOLATED APPELLANT'S RIGHTS TO DUE PROCESS AND A FAIR TRIAL WHEN IT ENTERED A JUDGMENT OF CONVICTION BASED ON INSUFFICIENT EVIDENCE AND WHICH WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF APPELLANT'S RIGHTS UNDER THE UNITED STATES AND OHIO CONSTITUTIONS.

[V.] THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN IMPOSING CONSECUTIVE SENTENCES ON THREE FIREARM SPECIFICATIONS.

## III. Discussion

### A. First Assignment of Error

{¶ 31} In the first assignment of error, appellant argues that the trial court erred by denying his motion to suppress the second search warrant to obtain historical cell site location data from his phone because the second search warrant was supported by evidence seized during the first search which had been found to have been unlawful.

{¶ 32} We first address plaintiff-appellee State of Ohio's argument, raised for the first time in its brief on appeal, that appellant did not have a reasonable expectation of privacy regarding the cell phone records. The state concedes in its brief that it did not raise this argument below, but it argues that it is entitled to alternative grounds for an affirmance of the trial court's suppression decision.

{¶ 33} The state's argument that appellant lacks a reasonable expectation of privacy in his cell site location data is a challenge to appellant's standing under the Fourth Amendment to the United States Constitution. *See State v. Wintermeyer*, 2019-Ohio-5156,

¶ 1. The state may defend against a motion to suppress by challenging a defendant's Fourth Amendment interest in the subject of the search or seizure. *Id*. at ¶ 3. "But when the state fails to dispute the defendant's standing in the trial court, it is foreclosed on appeal from attacking the trial court's judgment on those grounds." *Id*. Based on the foregoing, and the state's concession that it did not raise the argument below, we decline to address whether appellant had a reasonable expectation of privacy regarding the historical cell site location data.[2]

{¶ 34} Turning to the merits of the trial court's motion to suppress decision, appellant argues that evidence obtained as a result of the second search warrant should be excluded because the warrant was not supported by probable cause and the cell site location analysis is fruit of the poisonous tree based on the first search of appellant's cell phone having been deemed unlawful. Appellant also argues that the independent source doctrine does not apply to the second warrant.

{¶ 35} "The review of a motion to suppress is a mixed question of law and fact." *State v. Diaw*, 2025-Ohio-2323, ¶ 8. In reviewing a motion to suppress, an appellate court must accept the trial court's findings of fact if supported by competent, credible evidence and review the trial court's legal conclusions de novo. *Id*.

{¶ 36} Here, the trial court found that Detective Journey utilized "lawfully seized evidence from another independent source" to draft the affidavit in support of the second warrant relating to appellant's cell phone. (Oct. 11, 2023 Decision & Entry at 3.) As a result, the trial court concluded the second seizure of phone records was not a product of or tainted by the unlawful first seizure. The trial court also concluded the second affidavit was supported by probable cause.

{¶ 37} Under the exclusionary rule, evidence that is obtained as a result of a search or seizure that violates the Fourth Amendment must be suppressed. *Columbus v. Shepherd*, 2011-Ohio-3302, ¶ 42 (10th Dist.). "The exclusionary rule reaches not only primary evidence obtained as a direct result of an illegal search or seizure, but also evidence later discovered and found to be derivative of an illegality, or 'fruit of the poisonous tree.' "

---

[2] Even if the state had preserved the argument regarding appellant's privacy interest, Fourth Amendment standing is not jurisdictional in nature and, therefore, the court need not address the issue before reaching other substantive issues such as probable cause or the exceptions to a warrant requirement. *Wintermeyer* at ¶ 22, citing *Byrd v. United States*, 584 U.S. 395, 411 (2018).

*State v. Carter*, 1994-Ohio-343, 69 Ohio St.3d 57, 67, citing *Nardone v. United States*, 308 U.S. 338 (1939).

**{¶ 38}** An exception to the exclusionary rule is the independent source doctrine which allows the admission of evidence discovered by means entirely independent of any constitutional violation. *Columbus* at ¶ 42, citing *State v. Perkins*, 18 Ohio St. 3d 193, 194 (1985). The rationale is that the state should be put in the same, but not worse, position had the unconstitutional misconduct not occurred. *Perkins* at 195. "Therefore, the tainted evidence is admissible under the exception if it was discovered by independent lawful means." *Id.*; *see also Carter* at 67 (noting that the exclusionary rule does not apply if the connection between the illegal police misconduct and the discovery of evidence is attenuated "as where the police have an independent source for discovery of the evidence").

**{¶ 39}** In *Murray v. United States*, 487 U.S. 533 (1988), the United States Supreme Court noted that the question "is whether the search pursuant to warrant was in fact a genuinely independent source of the information and tangible evidence at issue here." *Murray* at 542. It noted that it would not be "if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." *Id.* In other words, "what counts is whether the actual illegal search had any effect in producing the warrant." *Id.* at fn. 3.

**{¶ 40}** Here, in its decision granting appellant's first motion to suppress, the trial court determined that the seizure of appellant's cell phone and the search of its contents were unlawful. Appellant argues that the state then used "illegally-procured data to draft a particularized second search warrant for the cell phone." (Appellant's Brief at 19.)

**{¶ 41}** The affidavit in support of the second warrant stated that the investigation of Winton's death led to the identification of a vehicle for which Johnson was the owner and who identified Penton and Penton's phone number. The affidavit further stated that the detective interviewed Penton who identified "Oozie" as being involved in the shooting. The affidavit explained that Penton's phone had been obtained pursuant to a search warrant, and that a search of Penton's phone contents had revealed a phone number for "Oozie" whose contact name was changed two days after the shooting. Columbus police reports identified the number as belonging to appellant. The affidavit also noted that fingerprint evidence from the vehicle matched to appellant. The affidavit stated it was more probable

than not that appellant had his phone on his person during the crimes being investigated and that evidence such as location data could be contained in the phone records.

{¶ 42} At the suppression hearing, Detective Journey testified that he was able to learn that T-Mobile was the carrier for appellant's cell phone number based on Accurint, a law-enforcement database. Detective Journey also testified that, although he had knowledge of what evidence was obtained as a result of the first search of appellant's phone, he did not use that information when he prepared the affidavit in support of the second warrant.

{¶ 43} We find that the information provided in the affidavit in support of the second warrant for appellant's cell phone was sufficient for the issuing judge to conclude there was a fair probability of evidence of a crime on the phone and, therefore, probable cause supported the second warrant. *See State v. Castagnola*, 2015-Ohio-1565, ¶ 34-35.

{¶ 44} Additionally, we find that the information provided in the affidavit in support of the second warrant does not appear to have been dependent on the evidence produced from or obtained as a result of the first unlawful seizure of appellant's cell phone or the search of its contents. The affidavit relied on other aspects of the investigation, including the investigation of Penton, Penton's phone, and fingerprint evidence extracted from Johnson's vehicle, as well as other sources to connect appellant to his phone number and to identify T-Mobile as his mobile carrier. On the facts presented here, we find that the information obtained from the first unlawful search and seizure of appellant's phone was not used to prepare the second affidavit nor was it presented to the judge for consideration in issuing the second warrant. Therefore, the trial court reasonably concluded that the second seizure of appellant's phone records was not a product of or tainted by the illegality of the first seizure.

{¶ 45} The fact that the same information was sought by both warrants, or ultimately obtained pursuant to both warrants, does not determine that the second seizure was a product of or tainted by the illegality of the first seizure. "[T]he re-seizure of evidence already seized and the re-observation of information already noticed is permissible as the underlying policy is the government should not be placed in a worse position than it would otherwise have occupied." *State v. Nickelson*, 2017-Ohio-7503, ¶ 30 (7th Dist.), citing *Murray* at 542.

{¶ 46} Because we find that the trial court did not err in relying on the independent source doctrine to deny the motion to suppress the second warrant, we overrule appellant's first assignment of error.

**B. Second Assignment of Error**

{¶ 47} In the second assignment of error, appellant argues that the trial court abused its discretion and denied appellant a fair trial by admitting repetitive and gruesome autopsy photographs of Winton's body.  In his reply brief, appellant also argues that the presentation of the photographs at issue constitutes plain error.

{¶ 48} We first note that appellant's trial counsel did not object to the autopsy photographs when they were introduced at trial and presented to the jury.  During the testimony of the forensic pathologist that conducted the autopsy, the state introduced 59 photographs.  The state noted for the trial court, "Your Honor, I believe without objection, the State's going to go through Exhibits . . . N-1 through -60 at this time." (Tr. Vol. III at 15.)  The court asked defense counsel whether there was any objection and defense counsel responded that there was none.  Later, during the examination of the same witness, the state began to introduce the photographs to the witness by stating, "The 59 photographs I'm going to show you," and defense counsel did not object.  (Tr. Vol. III at 24.)

{¶ 49} After closing arguments, and after the jury exited the courtroom, the trial court reviewed the admission of the state's exhibits with counsel.  At that time, defense counsel objected to the admission of the autopsy photographs, exhibits N1-N59, and stated, "The photographs from the autopsy include multiple views of the bullet wounds, and we would ask that they be restricted in number." (Tr. Vol. IV at 301.)  The trial court admitted the evidence and explained, "I don't feel that they were excessive or redundant -- or too redundant in any way.  I think they were pretty instructive as to the nature of the wounds.  So I'm going to allow those all to go back." (Tr. Vol. IV at 301.)

{¶ 50} This court has held that an objection to testimony or evidence "must be 'contemporaneous' to the alleged error." *State v. Petty*, 2017-Ohio-1062, ¶ 49 (10th Dist.), quoting *State v. Copley*, 2005-Ohio-896, ¶ 32 (10th Dist.), citing *State v. Murphy*, 2001-Ohio-112, ¶ 100.  The alleged error here is the admission of prejudicial autopsy photographs.  *See State v. Ford*, 2019-Ohio-4539, ¶ 257 (noting that exposure to gruesome photographs "serves to inflame the passions of jurors and risks subjecting them to harm").  Although defense counsel's objection to the ultimate admission of the photographs, if

sustained, would have prevented the photographs from being with the jury during its deliberations, the prejudicial impact of the photographs was present at the time they were shown to the jury during trial. Thus, to be "contemporaneous to the alleged error," defense counsel's objection to the photographs should have occurred when the photographs were presented to the jury.

{¶ 51} Although defense counsel ultimately objected to the admission of the autopsy photographs after closing arguments, defense counsel affirmatively stated he did *not* object to the presentation of the photographs when the state presented them to the jury during the forensic pathologist's testimony. And when defense counsel did object outside the jurors' presence after closing arguments, he requested only that the number of photographs be reduced, but counsel did not object on the basis of gruesomeness or identify the specific exhibits that should be excluded. Because defense counsel stated that he had no objection to exhibits N1 through N59 during their presentation to the jury, we find that appellant can complain only of plain error on appeal. *See Ford* at ¶ 252.

{¶ 52} Pursuant to Crim.R. 52(B), "plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." To establish plain error, an appellant "must establish that the trial court deviated from a legal rule, that the deviation was obvious, and that the deviation affected substantial rights." *State v. Gooch*, 2025-Ohio-4595, ¶ 23 (10th Dist.). "To satisfy the prejudice prong of a plain-error analysis," that is, whether the error affected substantial rights, "an appellant must demonstrate a *reasonable probability* that the plain or obvious error resulted in prejudice." (Emphasis in original.) *Id.* at ¶ 24. Thus, as applied here, appellant must establish (1) that the trial court erred by admitting the challenged photographs into evidence; (2) that the error was obvious; and (3) that there is a reasonable probability the admission of the photographs in evidence affected the outcome of the trial. *See, e.g., State v. Powers*, 2024-Ohio-1521, ¶ 10 (12th Dist.).

{¶ 53} The admission of photographic evidence is left to the trial court's discretion. *State v. Chatman*, 2009-Ohio-2504, ¶ 14 (10th Dist.), citing *State v. Maurer*, 15 Ohio St.3d

239, 264 (1984).  In noncapital cases, Evid.R. 403 governs the admissibility of gruesome photographs.[3]  *State v. Beasley*, 2025-Ohio-4463, ¶ 32 (8th Dist.).

{¶ 54}  Evid.R. 403(A) requires the exclusion of relevant evidence when "its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."  Evid.R. 403(B) allows for the discretionary exclusion of relevant evidence where "its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence."  The fact that a photograph is gruesome is not alone sufficient to render it inadmissible.  *Chatman* at ¶ 14, citing *Maurer* at 265.  Additionally, a stipulation to the cause of death does not mean that crime-scene or autopsy photographs are automatically inadmissible.  *Id.* at ¶ 15, citing *Maurer* at 265.

{¶ 55}  At issue in this case are the photographs, numbered exhibits N1 through N59. The forensic pathologist that conducted the autopsy testified that Winton had four gunshot wounds located in the left and right shoulders, the left armpit, and the neck.  Exhibits N23 through N31, N33 through N40, N42 through N49, N51 through N58 depict the gunshot wounds, in different angles or in wider or closer views.  These photographs support the testimony about Winton's injuries and appellant has not alleged that they are particularly gruesome.  Given the probative value of the photographs, we do not find the trial court committed obvious error in admitting them.

{¶ 56}  Appellant contends that some exhibits unnecessarily depict Winton's face. Exhibits N5 through N7, N23, and N46, for example, show Winton's face, some depicting his open eyes.  The forensic pathologist testified that exhibit N5 depicting Winton's face was used for identification purposes and N6 and N7 depicted the condition of the body as it arrived for the autopsy. Two other exhibits depicting Winton's face, N23 and N46, were presented in connection with a description of the gunshot wounds which happened to be in proximity to the upper portion of the body and depicted on a wider angle photograph of the gunshot wounds.  We find that the photos have probative value regarding the nature of Winton's injuries.  Even if we were to find the photographs to be irrelevant, unnecessary,

---

[3] In *State v. Mammone*, 2014-Ohio-1942, ¶ 130, the Supreme Court of Ohio explained that it had adopted a "stricter standard" for admitting gruesome photos in capital cases, citing its decision in *Maurer*, 15 Ohio St.3d 239, at paragraph seven of the syllabus. *Maurer* states that gruesome photos are admissible in a capital prosecution "as long as the danger of material prejudice to a defendant is outweighed by their probative value and the photographs are not repetitive or cumulative in number." *Maurer* at 266.

or cumulative, we do not find a reasonable probability that their admission affected the outcome of trial. "The mere fact that there are numerous photographs does not result in prejudicial error, absent gruesomeness or shock value." *Ford*, 2019-Ohio-4539, at ¶ 241, citing *State v. Diar*, 2008-Ohio-6266, ¶ 232.

{¶ 57} Eleven photographs, exhibits N10 through N21, depict Winton's hands. Appellant argued that these appear to be irrelevant and repetitive. But the forensic pathologist testimony indicated that it is typical for there to be "lots of photos" of a decedent's hands. (Tr. Vol. III at 28.) As noted above, the inclusion of numerous photographs does not alone demonstrate prejudice.

{¶ 58} The remaining exhibits at issue appear to be identifying photos that do not depict parts of the body.

{¶ 59} In sum, although numerous and somewhat cumulative, the photographs are not particularly gruesome and are relevant to support the forensic pathologist's testimony about the nature and location of the gunshot wounds. Moreover, even if we were to find obvious error with respect to the admission of the photographs, we do not find that appellant has demonstrated a reasonable probability that the outcome of trial would have been different. Therefore, on these circumstances, we cannot conclude that the trial court committed plain error by admitting exhibits N1 through N59.[4] Accordingly, appellant's second assignment of error is overruled.

## C. Third Assignment of Error

{¶ 60} In the third assignment of error, appellant argues that the trial court erred by failing to instruct the jury to view Johnson's testimony with grave suspicion as required by R.C. 2923.03(D).

---

[4] Appellant also argues that the Supreme Court of Ohio, in *State v. Ford*, 2019-Ohio-4539, provided "crystal-clear direction" that gruesome photographs of cadavers "serve no useful purpose whatsoever" if "an element of the offense is clearly proven by other evidence." (Internal quotations and citations omitted.) (Appellant's Reply Brief at 7.) We note that the Supreme Court in *Ford* found that the trial court did not err in admitting 15 crime-scene photographs, 14 autopsy photographs of one victim, including some which depicted injuries and were deemed gruesome, and 6 of 8 autopsy photographs of another victim. *Id*. at ¶ 238-57. Although the Supreme Court found that the trial court erred in admitting two autopsy photos that were deemed gruesome on the basis that they were cumulative of other photos, the Supreme Court ultimately concluded the error was harmless given the overwhelming evidence of the defendant's guilt. *Id*. at ¶ 255-56. The Supreme Court's caution that trial courts should "closely scrutinize the crime-scene and autopsy photos" presented in murder trials is well-taken, *id*. at ¶ 257, but we do not read it, as appellant suggests, to be a bright-line rule regarding the admission or exclusion of autopsy photographs.

{¶ 61} R.C. 2923.03(D) provides that a trial court must instruct the jury with specific language if "an alleged accomplice of the defendant testifies against the defendant in a case in which the defendant is charged with . . . an offense." Here, the trial court provided the statutorily prescribed language in substantial form as follows:

> The testimony of an accomplice does not become inadmissible . . . because of his or her complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his or her credibility and make his or her testimony subject to grave suspicion and require that it be weighed with great caution.

(Tr. Vol. IV at 217.)

{¶ 62} Appellant argues that the trial court should have given the jury the R.C. 2923.03(D) instruction with respect to Johnson's testimony in the same way it instructed the jury regarding Penton's testimony. Appellant acknowledges that defense counsel failed to object to the alleged omission, but argues that the omission was plain error.

{¶ 63} In response, the state argues that Johnson was not an accomplice for purposes of requiring the R.C. 2923.03(D) instruction because she was not indicted for the crime of complicity. The state further argues that, even if Johnson were an accomplice, the trial court substantially complied with R.C. 2923.03(D) and, even if it did not, the omission was not plain error.

{¶ 64} Regardless of whether Johnson was an accomplice for purposes of R.C. 2923.03(D), the trial court provided the jury with an instruction substantially complying with that statute that was not specific to Penton's testimony. Specifically, the trial court noted, "The testimony of an accomplice does not become inadmissible. . . because of his *or her* complicity[.]" (Emphasis added.) (Tr. Vol. IV at 217.)

{¶ 65} Although the trial court went on to provide the jury with the specific additional instructions related to Penton's testimony that appellant had requested,[5] the

---

[5] After the R.C. 2923.03(D) instruction was provided, the trial court provided the following instruction relating to Penton as requested by appellant:

accomplice instruction that was provided tracked the language required by R.C. 2923.09(D) and was not specific to Penton. Thus, we find that the trial court complied with R.C. 2923.03(D) and did not commit plain error. Accordingly, appellant's third assignment of error is overruled.

### D. Fourth Assignment of Error

{¶ 66} In the fourth assignment of error, appellant argues that his convictions were based on insufficient evidence and were against the manifest weight of the evidence.

{¶ 67} "[W]hether the evidence is sufficient as a matter of law to support a conviction involves a determination of whether the state met its burden of production at trial." *State v. Harris*, 2023-Ohio-3994, ¶ 14 (10th Dist.), citing *State v. Smith*, 2004-Ohio-4786, ¶ 16 (10th Dist.); *State v. Frazier*, 2007-Ohio-11, ¶ 7 (10th Dist.). In a sufficiency challenge, an appellate court does not weigh the evidence; rather, the court determines " ' "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." ' " *Harris* at ¶ 14, quoting *State v. Leonard*, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. A reviewing court "essentially assume[s] the state's witnesses testified truthfully and determine[s] if that testimony and any other evidence presented at trial satisfies each element of the crime." *Harris* at ¶ 14, citing *State v. Watkins*, 2016-Ohio-8272, ¶ 31 (10th Dist.), citing *State v. Hill*, 2008-Ohio-4257, ¶ 41 (10th Dist.). Thus, evidence is sufficient to support a conviction where, if believed, that evidence would permit any rational trier of fact to conclude that the state proved each element of the offense beyond a reasonable doubt. *Harris* at ¶ 14, citing *Frazier* at ¶ 7, citing *Jenks* at paragraph two of the syllabus.

---

You have heard the testimony of David Penton, Jr. You have also heard that the State has promised that he will not be prosecuted for aggravated murder, murder, and felonious assault in exchange for his cooperation. It is permissible for the State to make such a promise, but you should consider David Penton's testimony with more caution than the testimony of other witnesses.

You must consider whether his testimony may have been influenced by the State's promise. It is for you, as jurors, in light of all of the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth.

(Tr. Vol. IV at 218.)

{¶ 68} A manifest weight claim "attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion." *Harris* at ¶ 15, citing *State v. Richey*, 2018-Ohio-3498, ¶ 50 (10th Dist.), citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 11-13. Although the evidence may be sufficient to sustain a guilty verdict, a manifest weight challenge requires a different type of analysis. *Harris* at ¶ 15, citing *State v. Walker*, 2003-Ohio-986, ¶ 43 (10th Dist.). The weight of the evidence concerns the inclination of the greater amount of credible evidence offered in a trial to support one side of the issue rather than the other. *State v. Petty*, 2017-Ohio-1062, ¶ 60 (10th Dist.), citing *State v. Boone*, 2015-Ohio-2648, ¶ 49 (10th Dist.).

{¶ 69} Although an appellate court reviews credibility when assessing the manifest weight of the evidence, the court must be mindful that determinations regarding witness testimony and the weight of testimony are primarily for the trier of fact. *Harris* at ¶ 17, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. This is so because the trier of fact is best able " 'to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Harris* at ¶ 17, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984).

{¶ 70} Appellant argues that the state's case was based on inconsistent and unreliable testimony by the three witnesses who testified they were in the car with appellant during the shooting incidents. Appellant also notes that there was no forensic evidence linking appellant to the shooting. Appellant specifically argues that there was insufficient evidence on the element of prior calculation and design, an element of aggravated murder, because the state did nothing to confirm or disprove Penton's theory that appellant wanted to cash in on an alleged bounty for Winton.

{¶ 71} Even if conflicting testimony was presented at trial, "an accused is not entitled to a reversal on manifest weight grounds merely because inconsistent evidence was presented at trial." *State v. Rankin*, 2011-Ohio-5131, ¶ 29 (10th Dist.). "The finder of fact at trial is in the best position to weigh the credibility of testimony by assessing the demeanor of the witnesses and the manner in which they testify, their connection or relationship with the parties, and their interest, if any, in the outcome." *State v. Mullins*, 2016-Ohio-8347, ¶ 39 (10th Dist.).

{¶ 72} Here, after viewing the evidence in a light most favorable to the prosecution, we find that any rational trier of fact could have found the essential elements of the crimes for which appellant was convicted proven beyond a reasonable doubt. Three witnesses testified that appellant had a gun in Johnson's car on the day of the shootings and that they had reason to believe that appellant was the shooter. Additionally, Penton testified that he and appellant had a plan to target Winton. Therefore, we find that sufficient evidence supported the convictions.

{¶ 73} Additionally, we do not find that the jury lost its way and created a manifest miscarriage of justice with respect to the verdicts. The jury was in the best position to weigh the credibility of Penton, Walker, and Johnson and could reasonably believe the state's version of events. Thus, the verdicts are not against the manifest weight of the evidence.

{¶ 74} Based on the evidence and testimony presented, we find that sufficient evidence supported the convictions, and the verdicts were not against the manifest weight of the evidence. Appellant's fourth assignment of error is overruled.

### E. Fifth Assignment of Error

{¶ 75} In the fifth assignment of error, appellant argues that the trial court abused its discretion in imposing consecutive sentences for three firearm specifications.

{¶ 76} R.C. 2929.14(B)(1)(a) provides in relevant part that, if an offender is convicted of a firearm specification under R.C. 2941.145, as appellant was here, the court shall impose one of six prison terms described in the statute.

{¶ 77} Pursuant to R.C. 2929.14(B)(1)(b), the court "shall not impose" more than one prison term described in R.C. 2929.14(B)(1)(a) for a firearm specification accompanying felonies committed as part of the same act or transaction, *except as provided in R.C. 2929.14(B)(1)(g)*. A "transaction" for purposes of the firearm specification statute is "a series of continuous acts bound together by time, space and purpose, and directed toward a single objective." *State v. Wills*, 1994-Ohio-417, 69 Ohio St.3d 690, 691.

{¶ 78} R.C. 2929.14(B)(1)(g) provides that the trial court must impose more than one prison term if firearm specifications are associated with two or more qualifying felonies specified in the statute. The provision states as follows:

> If an offender is convicted of or pleads guilty to two or more felonies, if one or more of those felonies are aggravated murder, murder, attempted aggravated murder, attempted murder, aggravated robbery, felonious assault, or rape, and if

the offender is convicted of or pleads guilty to a specification of the type described under division (B)(1)(a) of this section in connection with two or more of the felonies, the sentencing court shall impose on the offender the prison term specified under division (B)(1)(a) of this section for each of the two most serious specifications of which the offender is convicted or to which the offender pleads guilty and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications.

R.C. 2929.14(B)(1)(g).

{¶ 79} Appellant's charges arose from two shooting incidents: the Wedgewood shooting and the Rabbit Hill shooting. Each of these are different transactions because they were separated by time, space, and purpose. *See Wills* at 691. For the Wedgewood shooting, appellant was found guilty of felonious assault along with the accompanying firearm and drive-by shooting specifications. For the Rabbit Hill shooting, appellant was found guilty of aggravated murder and two counts of murder along with an accompanying firearm and drive-by shooting specifications for each of the underlying offenses.

{¶ 80} R.C. 2929.14(B)(1)(g) applies to appellant's convictions for the Rabbit Hill shooting because appellant was found guilty of three felonies that are qualifying felonies (aggravated murder and murder), and he was also found guilty of the firearm specifications under R.C. 2941.145 accompanying each of those felonies. Therefore, R.C. 2929.14(B)(1)(g) instructs the trial court to impose "the prison term specified under division (B)(1)(a) of this section for each of the two most serious specifications of which the offender is convicted or to which the offender pleads guilty and, in its discretion, also may impose on the offender the prison term specified under that division for any or all of the remaining specifications."

{¶ 81} Here, however, the trial court merged the murder convictions into the aggravated murder conviction for purposes of sentencing.

{¶ 82} In *State v. Bollar*, 2022-Ohio-4370, ¶ 16, the Supreme Court of Ohio addressed the effect of merged offenses on the application of R.C. 2929.14(B)(1)(g). The Supreme Court explained that, for purposes of R.C. 2929.14(B)(1)(g), which applies when an offender is convicted of two or more qualifying felonies, "convicted" means "found guilty." *Id*. The Supreme Court concluded, "The statute makes no exception to the application of its provisions if one of the underlying felony offenses has been merged." *Id*. at ¶ 19.

{¶ 83} Here, appellant was convicted of two or more qualifying offenses relating to the Rabbit Hill shooting: aggravated murder and two counts of murder. Pursuant to *Bollar*, the merger of the murder counts into the aggravated murder count for purposes of sentencing did not affect the application or operation of R.C. 2929.14(B)(1)(g). Thus, pursuant to that statute, the trial court was required to impose a prison term for at least two of the firearm specifications accompanying those offenses. The trial court did so here by imposing a three-year prison term for the firearm specification on the aggravated murder count and for one of the merged murder convictions.[6]

{¶ 84} The crux of the dispute here seems to be that the trial court also imposed a prison term for the firearm specification attached to the felonious assault count arising from the Wedgewood shooting. Appellant characterizes this third firearm specification as something the trial court mistakenly believed was mandatory, rather than discretionary under R.C. 2929.14(B)(1)(g). *See* Appellant's Brief at 50 ("The trial court felt compelled to impose three firearm specification sentences when R.C. 2929.14(B)(1)(g) only requires two sentences.").

{¶ 85} Our reading of the trial court's sentencing decision in conjunction with the sentencing entry indicates that the trial court imposed only two prison terms for the firearm specifications relating to appellant's convictions for the Rabbit Hill shooting. The trial court did impose a third prison term for a firearm specification related to the Wedgewood shooting. However, as noted above, R.C. 2929.14(B)(1)(b) provides, in relevant part, that "[e]xcept as provided in division (B)(1)(g) of this section, a court shall not impose more than one prison term on an offender under division (B)(1)(a) of this section *for felonies committed as part of the same act or transaction*." (Emphasis added.) Thus, R.C. 2929.14(B)(1)(g) applied to appellant's convictions relating to the Rabbit Hill shooting because they were part of the "same act or transaction," but not to appellant's convictions relating to the Wedgewood shooting because it was a different act or transaction. And for the Wedgewood shooting, the court imposed only one firearm specification prison term as instructed by R.C. 2929.14(B)(1)(b).

---

[6] This is consistent with the trial court's statement at the sentencing hearing when it noted that there was a three-year firearm specification on the aggravated murder count and added, "apparently I have to pull a three-year firearm specification from one of the merged counts." (Nov. 16, 2023 Tr. Vol. I at 20.)

{¶ 86} Based on the foregoing, we do not find that the trial court abused its discretion in imposing consecutive sentences on three firearm specifications. Therefore, the fifth assignment of error is overruled.

## IV. Conclusion

{¶ 87} Based on the foregoing, we overrule appellant's five assignments of error and affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BEATTY BLUNT and MENTEL, JJ., concur.

_____